No. 14422

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

BERNARD JAMES FITZPATRICK,

Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

John L. Adams argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mike McCarter, Assistant Attorney General, argued,
Helena, Montana
James Seykora, County Attorney, Hardin, Montana

---

Submitted: October 30, 1979

Decided: FEB 7 - 1980

Filed: FEB 7 - 1980

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

A jury sitting in District Court, Yellowstone County, found Bernard James Fitzpatrick guilty of deliberate homicide, aggravated kidnapping and robbery. Fitzpatrick was sentenced to death for the crimes of deliberate homicide and aggravated kidnapping and to 100 years imprisonment for robbery by the Honorable Charles Luedke, district judge. The case is before this Court pursuant to the automatic review provisions of section 95-2206.12, R.C.M. 1947, now section 46-18-307 MCA, and the direct appeal of Fitzpatrick.

Before the homicide, Bernard James Fitzpatrick, (defendant), had been imprisoned in the Montana State Prison until March 28, 1975. Upon his release, defendant was greeted by two companions, Christine Fetters and Paul Manning. They provided defendant with transportation to Butte, Montana. Manning gave defendant a handgun. A few days later, Christine Fetters and the defendant traveled by bus to Billings, Montana.

On the morning of April 5, 1975, defendant was playing pool with Travis Holliday in the Standard Bar in Billings, when two men, Paul Bad Horse Jr. and Edwin Bushman, entered the bar. Bad Horse recognized Holliday and the two men conversed briefly. Shortly thereafter, introductions were made and the four men proceeded to play several games of pool. While playing pool, they discussed the feasibility of robbing the Safeway store in Hardin, Montana. Defendant picked up a napkin, drew lines on it to represent streets, and asked the others where the Safeway store and bank were located. "X's" were made in the appropriate places on the napkin. Bad Horse explained that an employee left the store at 10:00 p.m. each night and went to the local bank to make the night deposit.

After the discussion Bushman (who was driving his girlfriend's car) and Bad Horse agreed to take Holliday and defendant to a home on the west side of Billings. En route to the west side home, three teenage girls were picked up at Holliday's request. The defendant, gave directions to a residence on the south side of Billings, went into the residence and came out soon thereafter, placing what appeared to be a gun under his belt.

The four men and three girls arrived at the west side home at approximately 6:00 p.m. Once inside, Holliday and the defendant introduced the others to Gary Radi. As additional plans for the robbery were being made, defendant revealed the handgun he had placed under his belt. While the others examined the .45 caliber automatic, the defendant cautioned them to be careful because it was loaded.

Holliday asked Bushman for a ride to Hardin and Bushman agreed to do so. It was planned that Radi and defendant would take Radi's car (a metallic blue 1971 Pontiac) to Hardin and Holliday would travel with Bushman and Bad Horse. With one of the teenage girls in Radi's car and the other two girls in Bushman's car, the five men met in front of the Standard Bar in Billings. Again Holliday asked Bushman to provide transportation for the girls and Bushman agreed to take them to Hardin. The girl in Radi's car left the group at the Standard Bar. The parties agreed to meet at a filling station near Billings near the entrance to the interstate highway before departing to Hardin.

They arrived in Hardin at approximately 8:00 p.m. The girls were taken to the Becker Bar at Holliday's request. The five men then toured the downtown area in Bushman's car. They drove past the drive-in bank and the Safeway store.

-3-

When they returned to the Becker Bar, Holliday, Bad Horse, Radi and the defendant got into Radi's car and drove to the Safeway store while Bushman returned his girlfriend's car to his house in Hardin, and picked up his own car which contained a piece of rope in the trunk.

Bushman drove his car to the Safeway store. He cut the rope into two pieces approximately three and one-half feet in length and gave them to the defendant. The five men sat in the cars in front of the store until it closed at 10:00 p.m. When Everett Stoltz, the store manager, came out and drove away in a four wheel drive vehicle, Radi and defendant followed him. Monte Dyckman, the assistant store manager, came out of the store soon after and drove away in a pickup. Bushman, Bad Horse and Holliday followed him.

Everett Stoltz drove directly to his home, and Radi and defendant, realizing that Stoltz would not be making the night deposit, then drove to the drive-in bank located on the opposite corner from Stoltz's house. The men had agreed previously should either car follow the wrong employee, the occupants would go to the bank and wait for the deposit to be made.

Monte Dyckman stopped at the post office before turning onto the street to the bank. When the men in Bushman's car saw Dyckman turn into the drive-in bank, Holliday stated, "They've got him now." Bushman then drove to a filling station to prepare for the trip back to Billings.

At approximately 10:30 p.m., witnesses observed the Dyckman vehicle traveling at a high rate of speed down a major street in Hardin. Two persons were in the truck, a driver and a passenger slumped against the right-hand door. Following close behind Dyckman's vehicle was a dark blue car. Soon thereafter, a man driving on the interstate highway was passed

-4-

by a truck (he recognized as belonging to Monte Dyckman) and a car following Dyckman's vehicle. The vehicles were moving at a high rate of speed. They turned off the highway and stopped near a section of the highway known as the Toluca interchange.

In the early morning hours of April 6, 1975, Under Sheriff John Fergerson noticed the reflection of a taillight on a vehicle parked behind a gravel pile near the Toluca interchange. Fergerson approached the vehicle and recognized Monte Dyckman lying on the passenger seat with his hands tied behind his back. Monte Dyckman was dead. He had been shot twice with a gun held less than six inches from his head. Fergerson also noticed numerous footprints around Dyckman's truck and tiretracks leading into the area. A subsequent search of Dyckman's car revealed two .45 caliber brass shell casings.

Bushman, Holliday and Bad Horse arrived at Radi's house in Billings at approximately 2:30 a.m., April 6, 1975. Eventually, Radi returned without the defendant and the four men went inside to discuss the robbery. Radi explained that defendant grew tired of waiting for the store employee at the drive-in bank and had stepped out of the car, pulling off his mask. About that time Dyckman turned into the drive-in bank, stepped out of his car, and was seized by Radi and defendant. When asked how much money was taken, Radi stated that the bag contained only $200 in cash and some food stamps and checks. Radi told the others, "Fitz didn't have to shoot the kid. Boom, boom, he shot his head off." "Fitz" is identified as the defendant.

In the meantime, the defendant telephoned Christine Fetters at the home of his sister. Defendant instructed Christine Fetters to purchase two bus tickets to Butte and

-5-

meet him at the bus depot. While Christine Fetters was standing in line waiting to board the bus at 6:00 a.m., defendant walked into the depot. The couple boarded the bus and returned to Butte that morning. Defendant was apprehended two months later, on June 3, 1975, in Spokane, Washington, by a special agent of the Federal Bureau of Investigation.

The State of Montana filed an information charging Bushman, Bad Horse, Holliday, Radi and defendant with deliberate homicide, aggravated kidnapping and robbery. Trial was held in Billings, in October 1975. Bushman testified in behalf of the State and was granted immunity from prosecution. Radi and defendant were found guilty of all charges. Bad Horse and Holliday were found guilty of robbery.

On October 29, 1975, Radi and defendant were each sentenced to 100 years imprisonment for the crime of deliberate homicide; 100 years imprisonment for the crime of robbery; and death by hanging for the crime of aggravated kidnapping. Bad Horse and Holliday were each sentenced to 40 years for the crime of robbery.

This Court reversed the judgment of conviction of the defendant on July 29, 1977. A new trial was ordered. See State v. Fitzpatrick (1977), _____ Mont. _____, 569 P.2d 383, 34 St.Rep. 736.

Defendant was retried individually in February 1978. Again, defendant was found guilty of deliberate homicide, aggravated kidnapping and robbery. On April 5, 1978, the District Court sentenced defendant to death for the crime of deliberate homicide, to death for the crime of aggravated kidnapping and to 100 years imprisonment for robbery.

Defendant's case was certified to this Court on July 31, 1978, pursuant to section 95-2206.12, R.C.M. 1947, now section 46-18-307 MCA, which subjects the judgment of conviction and sentence of death to automatic review.

Cn direct appeal, defendant raises six issues, comprising four evidentiary questions and two questions concerning the death penalty. They are:

(1) Did the District Court err in permitting Bushman to repeat statements allegedly made by Radi on the night of the crime, when Fitzpatrick was not present?

(2) Did the District Court err in permitting Sheriff Robert Brown to give his opinion as to where a gun may have been buried?

(3) Did the District Court err in admitting into evidence the shell casing taken from Radi's vehicle some ten weeks after Dyckman's body was found, without requiring a foundation to connect defendant with the vehicle during the interim?

(4) Did the District Court err in refusing to grant defendant's motion for acquittal due to insufficiency of evidence at the close of the State's case?

(5) Did the District Court err in sentencing defendant to death for the crime of deliberate homicide, such penalty being an increase in the sentence previously imposed by the District Court in the first trial?

(6) Did the District Court err in sentencing defendant to death for the crime of aggravated kidnapping because the statute under which the sentence was imposed was unconstitutional at the time of the crime?

Issue 1. The State presented the District Court with two independent rationales under the rules of evidence for allowing Edwin Bushman to repeat statements made by Gary Radi on the night of the crime. Rule 801(d)(1)(A), Mont.R.Evid. provides: "(d) Statements which are not hearsay. A statement is not hearsay if-- (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is

-7-

(A) inconsistent with his testimony . . ." Rule 801(d)(2)(E),
Mont.R.Evid., says, ". . . A statement is not hearsay if. .
.(2) Admission by a party opponent. The statement is offered
against a party and is . . . (E) a statement by a co-conspirator
of a party during the course and in furtherance of the
conspiracy."

To lay a foundation for Bushman's testimony, prosecutors
for the State called Radi to the stand and questioned him
extensively concerning statements he allegedly made in his
house on the night of the crime. For example, the following
dialogue appears in the transcript:

"Q. At any time at your house that early morning
hours of April 6th, 1975, did you discuss the
robbing of the Safeway Store in Hardin, Montana?
A. Never.

". . .

"Q. Did you say anything or have a discussion
with anyone about the death or the shooting of
anyone? A. No." Tr. Vol. II, at 248-249.

On cross-examination by defense counsel, Radi reaffirmed
that the answers he had given on direct examination were
the truth. Having laid a foundation for the introduction of
Radi's prior inconsistent statements, the State called Edwin
Bushman to the stand. Bushman testified that Radi described
the crime to Holliday, Bad Horse and himself during the
early morning hours of April 6, 1975. Radi allegedly told
the others that he and the defendant abducted the store
employee at the drive-in bank, that defendant was upset
because there wasn't much money in the bag, and that defendant
had shot a hole through the windshield of Radi's car. Ultimately,
Radi described the homicide by saying, "Fitz didn't have
to shoot the kid. Boom, boom, he shot his head off."

-8-

Although Rule 801(d)(1)(A), was based on Federal Rule 801(d), it differs from its federal counterpart in one important respect. The Federal rule requires that the prior inconsistent statement was one "given under oath subject to the penalty of perjury at a trial or hearing, or other proceeding, or in a deposition." The Montana rule, in the words of the Commission on Rules of Evidence, "deletes the oath requirement as unnecessary and harmful to the usefulness of the rule." Therefore, applying the circumstances here to Rule 801(d)(1)(A), Bushman's testimony is not hearsay because Radi, the declarant, testified at trial and was subjected to cross-examination concerning the prior statement, which was inconsistent with his testimony. The testimony is admissible despite the fact that Radi's prior statements were made in his own home rather than in a legal proceeding under oath.

In this Court, defendant contends the State was allowed to call Radi as a witness, knowing he would deny making the statements, and was then allowed to impeach Radi without showing surprise in the change. Defendant fails to consider Rule 607, Mont.R.Evid.:

> "Rule 607. Who may impeach; party not bound by testimony.
>
> "(a) The credibility of a witness may be attacked by any party, including the party calling him.
>
> "(b) No party is bound by the testimony of any witness."

We adopted the Rules of Evidence on December 29, 1976, and ordered the effective date for implementation of the rules to be July 1, 1977, for all trials held thereafter. 34 St.Rep. 302A. The Commission Comment following Rule 607 discusses the issue of surprise:

-9-

". . . A requirement exists, both at common law
and under Montana cases, that before one's
own witness could be impeached by prior in-
consistent statement, the party had to show
surprise at the change and that the change
had caused prejudice to his case.  State v.
Bloor, 20 Mont. 574, 584, 52 P. 611 (1898);
State v. Willette, 46 Mont. 326, 330, 127 P.
1013 (1912); and State v. Kinghorn, 109 Mont.
22, 36, 93 P.2d 964 (1939).  These requirements
have also been applied to impeachment by contra-
diction.  Dick v. King, 73 Mont. 456, 459, 236
P. 1093 (1925).  However, the requirements
have been liberally construed so that the
surprise does not have to take place while the
witness is on the stand, but may occur before
testimony is given.  State v. Clark, 87 Mont.
416, 420, 288 P. 196 (1930) and State v. Kinghorn,
supra.

"Subdivision (a) is consistent with Rule 43(b),
M.R.Civ.P., allowing a party to impeach and not
be bound by the testimony of a hostile witness
or adverse party.  It is also consistent with
Rule 26(d)(1), M.R.Civ.P., allowing impeachment
of any witness with his deposition.

"Therefore, under existing Montana law, a party
can impeach his own witnesses by contradiction
or prior inconsistent statement where he shows
surprise and prejudice, or where the witness
is hostile or the adverse party.  As a practical
consideration, it is likely that a party can
impeach his own witness as the need arises under
the existing Montana law.  The effect of this
rule is simply to remove these artificial require-
ments by abolishing the traditional rule.  This
also somewhat broadens the methods of impeaching
one's own witness.

"The corollary to the traditional rule not allowing
impeachment of one's own witness, that a party is
bound by the testimony of his witness, is contained
in Montana case law.  Tebay Land and Livestock Co.
v. Hastie, 64 Mont. 509, 517, 210 P. 605 (1922);
Sommerville v. Greenhood, 65 Mont. 101, 120, 210
P. 1048 (1922); and Welch v. Nepstead, 135 Mont.
65, 75, 337 P.2d 14 (1959).  The rule expressed
by these cases is inconsistent with the idea that
a party may impeach his own witness, for a party
cannot be bound by testimony he has impeached.
Therefore, to the extent that these cases are
inconsistent with subdivision (b) of this rule,
they are expressly superseded."

Radi's prior inconsistent statements were properly

admitted into evidence under Rule 801(d)(1)(A), Mont.R.Evid.

and could be considered as substantive evidence by the jury.

Advisory Committee's Note 56 F.R.D. 183, 296 (1972);    See also:
Commission Comment, Rule 801, Mont.R.Evid.

Turning to the State's second rationale for admitting
Bushman's testimony, defendant contends any conspiracy that
may have existed in this case ended before Radi made the state-
ments in his home.   Three United States Supreme Court cases--
Lutwak v. United States (1953), 344 U.S. 604, 73 S.Ct. 481,
97 L.Ed. 593; Krulewitch v. United States (1949), 336 U.S.
440, 69 S.Ct. 716, 93 L.Ed. 790; and Fiswick v. United
States (1946), 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196;--are
cited for the proposition that hearsay declarations of a
conspirator made after the conspiracy terminated are inadmissible
against coconspirators.   But had the conspiracy in defendant's
case ended?   In Fiswick and Krulewitch, the statements had
been made by the conspirators after they had been arrested,
and this fact persuaded the Supreme Court to find that the
conspiracies had ended.   In Lutwak, the Supreme Court searched
the record, found only one instance where a declaration made
after the conspiracy had ended was admitted, and held the
error to be harmless.   However, in this case, the statement
was made approximately four hours after Monte Dyckman was
robbed and killed and during the first rendezvous of the
conspirators following the crime.   The transcript is replete
with evidence of a conspiracy that extended for weeks after
the statement was made on the night of the crime.   Christine
Fetters recalled a conversation that took place approximately
one week after the shooting that reveals the on-going cooperation
of the conspirators in an effort to accomplish their criminal
goal:

-11-

"Q.   Now, what is the first point in time
when you heard conversations or were present
when conversations were taking place between
Mr. Radi and Mr. Holliday and Mr. Fitzpatrick?
A.   Well, that would be in Gary's home after
the second trip.  It would have been on the
third trip to Billings.

"Q.   This is in April now.  A.   Oh, yes.

"Q.   As I recall, you testified before it was
around the middle of April; is that right?
A.   I think it was around the middle of April,
right.

"Q.   And who was present when those conversations
were taking place?  A.   Well, there was different
people different times.

"Q.   Let's talk about the first conversation.
A.   That was in Gary Radi's house with the two
younger girls and what I think was an Indian.

"Q.   And what was said at that time?  A.   Mr.
Holliday asked him why he didn't follow him back
from Hardin.

"Q.   Asked who?  A.   I guess he was talking to
Gary.  Gary answered.  He asked why they didn't
follow him back from Hardin and he said that
they didn't think he was coming, then they seen
that he was late.  They didn't have time to put
the masks on.

"Q.   Mr. Radi said that to Mr. Holliday in
Mr. Fitzpatrick's presence, is that correct?
A.   Yes.

"Q.   Were there any other conversations that
took place at this point in time?  A.   (No
response.)

"Q.   At the Radi house when those persons were
present.  A.   Well, just that the -- He said,
'The crazy son-of-a-bitch blew his head off'
around about that time.

"Q.   Was there anything discussed or said
about money, receipts, at that time?  A.   Yes,
he said -- Mr. Holliday looked at Radi and asked
him 'How much money did you get?'  He said,
'It was mostly checks and food stamps.'

"Q.   What was Mr. Holliday's reaction to that?
A.   He acted very perturbed, pissed off.

"Q.   Now, was there a second conversation that
was had in your presence and in the presence
of Mr. Fitzpatrick and Mr. Radi in regard to
this transaction?  A.   To what transaction?

"Q.   Well, in regard to the Hardin murder.  A.
Well, that's when we were going into the
Holiday Inn.

-12-

"Q. And who was present at that time?
A. There was a blonde girl but I'm positive her name was Bonnie, myself, Fitz and Gary Radi.

"Q. And what was said at that time? A. Something about 'Did you think we went far enough?' Something about sand dunes, sand pits. I don't remember the exact words.

"Q. Who made that statement? A. Gary Radi.

"Q. Who was he making it to? A. Fitz.

"Q. What did he say, again? A. Just that did you think we went far enough to the sand dunes or sand pits or something like that.

"Q. What did Mr. Fitzpatrick say? A. He never said nothing. Just like a look to shut up.

"Q. Was there anything else said at that time? A. Something about a -- Let me try to figure and get this straight.

"(Pause.)

"A. Something about 'Don't you think one would have been enough?'

"Q. And Mr. Radi was saying that to Mr. Fitzpatrick? A. Yes.

"Q. And what did Mr. Fitzpatrick say, if anything? A. He acted disgusted. I think, you know, the idea I got is he wanted him to shut up.

"Q. Was there anything else said about a gun being hot at that time? A. I think he said, he asked him if--

"Q. Who is 'he' now, again? A. Gary Radi said, 'What did you do with it?' And he said, 'Don't worry about it. I buried it.'

"Q. Mr. Fitzpatrick said that. A. Yes, that was his answer." Tr. Vol. V, pp. 1012-1015.

The conspiracy was still viable a week after the robbery and homicide was committed. Therefore, Radi's statements on the night of the crime were made "during the course and in furtherance of the conspiracy." Finally, defendant challenges the admission of Radi's statements under either of the hearsay exceptions as violating his constitutional right to confront the witnesses against him, guaranteed by

-13-

the Sixth Amendment to the Constitution of the United States and the 1972 Mont. Const., Art. II, §24.

Fitzpatrick was not charged with engaging in a conspiracy in this case, but it is not necessary that the charge of conspiracy be made. Evidence of the conspiracy is admissible, not "for the purpose of allowing a conviction of a crime not charged, but to lay a foundation for the admission of evidence." State v. Dennison (1933), 94 Mont. 159, 163, 21 P.2d 63, 64. In its instruction no. 27 in this case, the court told the jury, without objection (no objection could have been sustained in this case), that if two or more persons agree to commit a crime, each person in the agreement is held responsible for all the consequences which might reasonably be expected to flow from carrying into effect the unlawful agreement, including a death not specifically intended. As this Court said in State v. Dennison, supra, 94 Mont. at 163, 21 P.2d at 64, where two or more persons are present at the scene of a crime, with no disinterested eyewitness available, it is important to establish, if possible, concerted action. In the absence thereof all may escape just punishment because of the State's inability to prove which one of those present was the actor in the crime. Proof therefore of a preconceived plan or design is necessary, not to prove the conspiracy, but to connect those present with the crime committed.

This Court, in State v. Fitzpatrick, supra, granted defendant a new trial on the charges at hand because he had been denied the right to confront Radi on cross-examination before the trier of fact. Radi and defendant were codefendants in the initial trial and Radi did not testify. Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, controlled. In Bruton, codefendants Bruton and Evans had

-14-

been tried jointly and convicted of armed postal robbery. During the trial a postal inspector testified Evans confessed that Bruton and Evans committed the robbery. Evans' conviction was reversed because his Miranda rights had been violated. Bruton's conviction was upheld by the Court of Appeals, Eighth Circuit, 375 F.2d 355, on the theory the trial court sufficiently instructed the jurors not to consider Evans' confession as evidence against Bruton. The Court relied on Delli Paoli v. United States (1957), 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278, which approved this procedure. The United States Supreme Court, overruling Delli Paoli, reversed Bruton's conviction and challenged the assumption that the prejudicial effect of such testimony could be overcome by jury instructions. The Court determined that substantial weight was added to the government's case in a form not subject to cross-examination (because Evans, the declarant, did not testify). Therefore, Bruton's Sixth Amendment right to confront witnesses against him was violated, and the violation was not cured by the trial court's instruction.

The circumstances in Bruton were virtually the same as those in defendant's first trial. Five defendants were tried jointly, and Bushman, under a grant of immunity from prosecution, repeated, under oath, statements by Radi inculpating defendant. Because defendant was denied the right to confront Radi on cross-examination and the District Court's cautionary instruction to the jury was insufficient to eliminate the prejudice, we reversed.

Bushman repeated Radi's statements at defendants second trial, but after Radi himself had testified and denied making the statements. Radi was also called as a witness by defendant

-15-

and again Radi denied making any statements concerning the robbery and homicide on the night of the crime.  Nonetheless, defendant argues his constitutional right of confrontation was violated by the introduction of Bushman's testimony. Two cases--California v. Green (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489; and Nelson v. O'Neill (1971), 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222;--are on point.

In Green, a minor testified at the defendant's preliminary hearing, naming the defendant as his supplier of marijuana. At trial, the minor, despite admitting he made the earlier statement, claimed he was uncertain how he obtained the marijuana because he was on LSD at the time. The prior inconsistent statements were admitted as substantive evidence. The defendant was convicted and the District Court of Appeal reversed, holding the use of the prior statements for the truth of the matter asserted therein denied defendant his right of confrontation.  The California Supreme Court affirmed and the United States Supreme Court granted the State's petition for certiorari.

Discussing the origin and development of the Confrontation Clause, the Supreme Court stated:

> "Our own decisions seem to have recognized
> at an early date that it is this literal right
> to 'confront' the witness at the time of trial
> that forms the core of the values furthered by
> the Confrontation Clause:
>
> "'The primary object of the constitutional
> provision in question was to prevent depositions
> or ex parte affidavits, such as were sometimes
> admitted in civil cases, being used against the
> prisoner in lieu of a personal examination and
> cross-examination of the witness in which the
> accused has an opportunity, not only of testing
> the recollection and sifting the conscience of

-16-

the witness, but of compelling him to stand
face to face with a jury in order that they
may look at him, and judge by his demeanor
upon the stand and the manner in which he
gives his testimony whether he is worthy of
belief.' Mattox v. United States, 156 U. S.
237, 242-243 (1895).

"Viewed historically, then, there is good
reason to conclude that the Confrontation
Clause is not violated by admitting a declarant's
out-of-court statements, as long as the
declarant is testifying as a witness and subject
to full and effective cross-examination."
California v. Green, supra, 399 U.S. at 157.

Defendant's reliance on Bruton is misguided. The Supreme

Court distinguished Bruton in Green, saying ". . . The Court

again emphasized that the error arose because the declarant

'does not testify and cannot be tested by cross-examination,'

391 U.S. at 136, suggesting that no confrontation problem

would have existed if Bruton had been able to cross-examine

his co-defendant." 399 U.S. at 163. The Court concluded

". . . the Confrontation Clause does not require excluding from

evidence the prior statements of a witness who concedes making

the statements, and who may be asked to defend or otherwise

explain the inconsistency between his prior and his present

versions of the events in question, thus opening himself to

full cross-examination at trial as to both stories." 399 U.S.

at 164. Although the precise holding in Green refers to

prior statements affirmed by the declarant, the Court in

Nelson, was faced with a situation in which a codefendant

took the stand and denied making a prior confession implicating

O'Neil. Responding to a claim that effective confrontation

is possible only if the witness affirms the prior statement

as his, the Court said ". . . Of course a witness can be

cross-examined concerning a statement not 'affirmed' by

him,. . ." Nelson v. O'Neill, supra, 402 U.S. at 627, and

concluded ". . . that where a co-defendant takes the stand in his

own defense, denies making an alleged out-of-court statement

implicating the defendant, and proceeds to testify favorably

-17-

to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments. . ." 402 U.S. at 629.

Radi, although not a codefendant at defendant's second trial, was called as a witness by the State and denied making the out-of-court statement. He reaffirmed his testimony on cross-examination by defense counsel. Two days later Radi testified for the defense and again he testified favorably to the defendant. Radi stood face to face with the jury on two occasions and was cross-examined by both the State and the defendant concerning the prior statement. Bushman was properly allowed to testify concerning Radi's out-of-court statements and defendant's constitutional right of confrontation was not violated because Radi testified as a witness and was subject to full and effective cross-examination.

Issue II. Christine Fetters testified that one week after the crime she rode with defendant in a car to the outskirts of Billings. Defendant parked the car along the road, took a handgun from underneath the seat, and stepped out of the car. He then walked over an embankment in an open field but out of her sight. When defendant returned approximately fifteen minutes later, he no longer had the gun and his hands were muddy.

Sheriff Robert Brown told the jury that Christine Fetters assisted him in an investigation on February 23, 1978, in which a search for the handgun was conducted. During direct examination the County Attorney asked Sheriff Brown:

> "And were you able to make a determination after your investigation with Christine Fetters where the weapon was probably located?"

Defense counsel objected to the question as calling for the witness opinion. The objection was overruled and the sheriff responded:

> "Yes, sir, it's believed to be under the parking lot of the Metra."

Defendant contends the sheriff was improperly permitted to give his opinion concerning the location of the handgun, and such testimony added credence to Christine Fetter's testimony, resulting in prejudice to defendant.

Rule 701, Mont.R.Evid., states:

> "Rule 701. Opinion testimony by lay witnesses.
>
> "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

The sheriff's opinion was not rationally based on his own perceptions and the District Court should have sustained the objection. However, any error, defect, irregularity, or variance in a criminal proceeding which does not affect substantial rights shall be disregarded. Section 95-2425, R.C.M. 1947, now section 46-20-702 MCA. No longer is prejudice presumed when error is shown, and it is for this Court to determine whether an error affects the substantial rights of the defendant. State v. Byrd (1910), 41 Mont. 585, 111 P. 407. We will not reverse a judgment for harmless error and the question of whether a particular error is harmful or harmless depends on the facts of the case under review. State v. Straight (1959), 136 Mont. 255, 347 P.2d 482.

Cross-examination by defense counsel clarified Sheriff Brown's testimony:

> "Q. Mr. Brown, in other words you followed the directions Miss Fetters gave you and arrived at a speculative conclusion as to where the weapon was supposedly at, is that correct?

A. That is correct, sir.

"Q. But you didn't find any weapon, did you?
A. No, sir, we did not.

"Q. You don't even know that you went to the area, do you? A. By the information she gave us, she was sure it was there.

"Q. She was certain that it was the area in question? A. She said it appeared to be the area that it was left.

"Q. She couldn't be definite, could she? A. No, sir." Tr. Vol. III, at 700, 701.

The weapon that was used to shoot Monte Dyckman was never found. Christine Fetters' testimony concerning defendant's disposal of a handgun was unquestionably relevant. Sheriff Brown's testimony, taken as a whole, reveals that he believed the handgun was located under the parking lot because of information Christine Fetters had given him. We conclude the sheriff's testimony did not affect substantial rights of the defendant.

Issue III. Gary Radi was arrested in Rawlins, Wyoming, on June 27, 1975. His automobile, a 1971 Pontiac Grand Prix, was searched by the deputy sheriff of Carbon County, Wyoming. Approximately 75 to 100 items were taken from the vehicle. Of significance in the recovery was a ski mask found in the trunk and a spent .45 caliber shell casing discovered under the back seat. Defense counsel objected to the introduction of the items at defendant's trial on the grounds that they were irrelevant to a determination of defendant's guilt or innocence. The objections were overruled. In this Court, defendant argues the shell casing should not have been admitted into evidence because it was discovered at a point in time too remote from the day of the crime to be of any probative value. Defendant also repeats his objection that the shell casing was irrelevant evidence in his trial

-20-

because he was not connected with the car during the time between the night of the crime and the day of Radi's arrest. As a practical matter, defendant's argument applies to both the shell casing and the ski mask.

Rule 401, Mont.R.Evid., defines relevant evidence:

"Rule 401. Definition of relevant evidence.

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant."

The Commission stated this test of relevance:

"The test of relevance is whether an item of evidence will have any value, as determined by logic and experience, in proving the proposition for which it is offered. The standard used to measure this acceptable probative value is 'any tendency to make the existence of any fact . . . more probable or less probable than it would be without the evidence.' This standard rejects more stringent ones which call for evidence to make the fact or proposition for which it is offered more probable than any other. It is meant to allow wide admissibility of circumstantial evidence limited only by Rule 403 or other special relevancy rules in Article IV."

Prior to moving for admission of the shell casing and ski mask, the State presented evidence placing defendant in Radi's automobile, in Hardin, Montana, on the night of the crime. Defendant had a .45 caliber handgun in his possession and he wore a ski mask while he was sitting in Radi's car at the drive-in bank in Hardin. Finally, the testimony showed defendant shot a hole through the windshield of Radi's car with the .45 caliber handgun.

A contention similar to defendant's was made in State v. Doe (1965), 146 Mont. 501, 409 P.2d 439, wherein the District Court admitted into evidence two .25 caliber shell casings taken from a car in which the defendant had been riding just before he allegedly shot a man four times with a .25 caliber automatic pistol. Responding to a claim that

-21-

a proper foundation had not been laid for the admission

of the shell casings, this Court said:

> "In State v. London, 131 Mont. 410, 310 P.2d
> 571, this court held that any exhibit having
> a direct connection with the commission of a
> crime is admissible.
>
> "In State v. Allison, 122 Mont. 120, 133, 199
> P.2d 279, 287, we said: 'The applicable rule
> of law is stated by this court as follows in
> State v. Harris, 66 Mont. 34, 213 P. 215,
> 217: "* * * the general rule being that weapons
> found at or near the place of arrest are
> properly admitted in evidence as a part of the
> history of the arrest, and as bearing on the
> crime, although not clearly shown to have been
> the property of the accused or used in the
> commission of the crime."'
>
> "'"Weapons, tools, bullets, instruments, or
> other articles which appear from other evidence
> to have been employed in the commission of the
> crime are admissible in evidence." State v.
> Byrne, 60 Mont. 317, 325, 199 P. 262, 264.'
> Also 22A C.J.S. Criminal Law § 712.   IV Nichols,
> Applied Evidence, p. 3276, §341, and V Nichols,
> Applied Evidence, p. 4716, § 9."   State v. Doe,
> supra, 146 Mont. at 504-505, 409 P.2d at 411.

The articles here, a ski mask and a shell casing, had

been linked to defendant and to the commission of the crime

by the State.   Indeed, the admission of the articles at

defendant's trial had a tendency to make the existence of

those facts more probable, and, by definition, were relevant.

As for defendant's argument of remoteness, "the objection

that evidence is too remote is directed to the discretion of

the [district] court and is a matter that goes to the credibility

of the evidence rather than its admissibility [citing cases]

unless the remoteness is so great that the proffered evidence

has no evidentiary value.   (State v. Pemberton, 39 Mont.

530, 104 P. 556; People v. Boggess, 194 Cal. 212, 228

Pac. 448.)"   State v. Satterfield (1943), 114 Mont. 122, 127,

132 P.2d 372.

In State v. Nelson (1961), 139 Mont. 180, 186, 362

P.2d 224, 228, we said:

"In 22 C.J.S. Criminal Law § 638, p. 977,
it is stated: 'Whether evidence is inadmissible
because of remoteness rests largely in the
sound discretion of the trial court, the objection
going to the weight of the evidence, rather than
to admissibility. In this connection, remoteness
has regard to factors other than mere lapse of
time, and is to be determined by the circumstances
of the case.'

"Wharton's Criminal Evidence (12th ed.), § 149,
p. 291, states: 'There is no fixed standard for
determining remoteness. It is therefore necessary
to consider all the circumstances of the case,
the nature of the act indicated or shown by the
evidence offered, and the nature of the crime.
In any case, the determination of whether evidence
is too remote to be relevant is left to the
discretion of the trial judge, and his decision
will not be reversed in the absence of clear proof
of an abuse of that discretion.'"

When the circumstances of defendant's case are considered--

witnesses had testified defendant possessed a .45 caliber

handgun which he intended to use in a robbery and that he

wore a ski mask while waiting in Radi's car at the

drive-in bank--we do not find that the District Court abused

its discretion by admitting into evidence a ski mask and .45

caliber shell casing taken from Radi's car less than three

months after the crime.

Issue IV. When the State rested, defense counsel moved

that the court direct the jury to acquit defendant due to

insufficiency of evidence. The motion was denied and defendant

alleges error. Specifically, defendant argues that most of

the evidence was circumstantial and the remainder was improperly

admitted.

Defendant's motion was made under section 95-1909(9),

R.C.M. 1947, now section 46-16-403 MCA, which provides:

"(9) When at the close of the state's evidence
or at the close of all the evidence, the evidence
is insufficient to support a finding or verdict
of guilty, the court may, on its own motion or on
the motion of the defendant, dismiss the action
and discharge the defendant. However, the court
may allow the case to be reopened for good cause
shown."

-23-

The motion for dismissal in criminal cases is often referred to as a motion to acquit or a motion for directed verdict. State v. French (1975), 166 Mont. 196, 531 P.2d 373. A directed verdict in a criminal case is granted in this jurisdiction only where the State fails to prove its case and there is no evidence upon which a jury could base its verdict. State v. Paulson (1975), 167 Mont. 310, 538 P.2d 339; State v. Solis (1973), 163 Mont. 293, 516 P.2d 1157.

The facts recited heretofore were taken from the transcript of the State's case-in-chief. Defendant's challenges concerning Edwin Bushman's testimony, Sheriff Robert Brown's testimony, and the admission of items taken from Gary Radi's car have been determined to be meritless. As for defendant's challenge that most of the evidence was circumstantial, "Circumstantial evidence is not always inferior in quality nor is it necessarily relegated to a 'second class status' in the consideration to be given it. The very fact it is circumstantial is not a sufficient allegation to justify a reversal of the judgment for such evidence may be and frequently is, most convincing and satisfactory." State v. Cor (1964), 144 Mont. 323, 326-327, 396 P.2d 86, 88.

". . . In determining the sufficiency of circumstantial evidence to make a case for the jury and to sustain a conviction, all of the facts and circumstances must be taken into consideration collectively." State v. De Tonancour (1941), 112 Mont. 94, 98, 112 P.2d 1065, 1067.

When all of the facts and circumstances of the State's case against defendant are considered, including the evidence we have held was properly admitted, an unmistakable conclusion is reached. Defendant purposely kidnapped, robbed, and caused the death of Monte Dyckman. The motion for dismissal was properly denied.

Issue V.  Following his initial conviction for deliberate homicide, defendant was sentenced to 100 years imprisonment by the Honorable Nat Allen.  The Honorable Charles Luedke sentenced defendant to death for the same crime when he was reconvicted on the charge after a new trial.  Judge Luedke imposed the ultimate penalty for three reasons:  (1) the defendant testified at the second trial, allowing for an assessment of his character; (2) Christine Fetters, a witness who did not testify at the first trial, yielded considerable information concerning defendant's conduct during the planning and execution of the crime, as well as his actions subsequent to the commission of the crime; and, (3) the constitutionality of the death penalty provision for the crime of deliberate homicide was no longer in doubt as it had been when the initial sentence was imposed.

Defendant contends the rule in North Carolina v. Pearce (1969), 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656, prohibits the District Court judge from increasing the sentence for deliberate homicide.  In Pearce, the United States Supreme Court examined the cases of two defendants who received increased sentences from trial judges after new trials were held pursuant to appellate court decisions. Neither of the trial judges had set forth reasons for increasing the punishment, and the Supreme Court, concerned that the defendants were being penalized for exercising their constitutional rights, said:

> "Due process of law, then, requires that vin-
> dictiveness against a defendant for having
> successfully attacked his first conviction
> must play no part in the sentence he receives
> after a new trial.  And since the fear of
> such vindictiveness may unconstitutionally
> deter a defendant's exercise of the right to
> appeal or collaterally attack his first
> conviction, due process also requires that

-25-

a defendant be freed of apprehension of
such a retaliatory motivation on the part
of the sentencing judge.

"In order to assure the absence of such a
motivation, we have concluded that whenever
a judge imposes a more severe sentence upon
a defendant after a new trial, the reasons
for his doing so must affirmatively appear.
Those reasons must be based upon objective
information concerning identifiable conduct
on the part of the defendant occurring after
the time of the original sentencing proceeding.
And the factual data upon which the increased
sentence is based must be made part of the
record, so that the constitutional legitimacy
of the increased sentence may be fully reviewed
on appeal."   395 U.S. at 725.

Defendant argues that none of the District Court's

reasons for increasing the sentence concern "identifiable

conduct on the part of the defendant occurring after the

time of the original sentencing proceeding."  Therefore, if

the Pearce rule applies, defendant's sentence was improperly

increased.

The United States Supreme Court has had numerous occasions

since the Pearce decision to examine the rule against retaliatory

sentencing.  Colten v. Kentucky (1972), 407 U.S. 104, 92

S.Ct. 1953, 32 L.Ed.2d 584, concerned the applicability of

the Pearce rule to Kentucky's two-tiered system of criminal

adjudication.  Kentucky allows a misdemeanor defendant who

is convicted in an inferior trial court to seek a trial de

novo in a court of general jurisdiction. The appellant in

Colten claimed the Constitution prevented the court of

general jurisdiction from imposing a sentence in excess of

that imposed in the inferior trial court.  The Supreme Court

rejected the Pearce anology, saying:

"Our view of the Kentucky two-tier system of
administering criminal justice, however, does
not lead us to believe, and there is nothing
in the record or presented in the briefs to
show, that the hazard of being penalized for
seeking a new trial, which underlay the holding
of Pearce, also inheres in the de novo trial
arrangement.  Nor are we convinced that defendants

-26-

convicted in Kentucky's inferior courts would be deterred from seeking a second trial out of fear of judicial vindictiveness. The possibility of vindictiveness, found to exist in <u>Pearce</u>, is not inherent in the Kentucky two-tier system.

"We note first the obvious: that <u>the court which conducted Colten's trial and imposed the final sentence was not the court with whose work Colten was sufficiently dissatisfied to seek a different result on appeal; and it is not the court that is asked to do over what it thought it had already done correctly</u>. Nor is the <u>de novo</u> court even asked to find error in another court's work. Rather, the Kentucky court in which Colten had the unrestricted right to have a new trial was merely asked to accord the same trial, under the same rules and procedures, available to defendants whose cases are begun in that court in the first instance. . ." (Emphasis added.) 407 U.S. at 116, 117.

See also: State v. Fissette (1972), 159 Mont. 501, 498 P.2d 1208, in which we applied the <u>Colten</u> rule to our justice and District Court system.

Any question as to whether or not the "possibility of vindictiveness" formed the basis of the <u>Pearce</u> rule was resolved in Chaffin v. Stynchcombe (1973), 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714, involving the imposition of a higher sentence by a jury upon retrial. In the words of Mr. Justice Powell:

"Subsequent cases have dispelled any doubt that <u>Pearce</u> was premised on the hazard of vindictiveness. In <u>Moon</u> v. <u>Maryland</u>, 398 U. S. 319, 90 S.Ct. 1730, 26 L.Ed.262 (1970), a case granted with a view to determining the retroactivity of <u>Pearce</u>, the Court ordered the case dismissed as improvidently granted when it became clear that there was no claim there that the higher sentence received on retrial was a product of vindictiveness on the part of the sentencing judge. Because counsel for the reconvicted defendant eschewed that contention, the Court held that 'there is no claim in this case that the due process standard of <u>Pearce</u> was violated.' <u>Id</u>., at 320. A similar focus on actual vindictiveness is reflected in the decision last Term in <u>Colten</u> v. <u>Kentucky</u>, 407 U. S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). The question in that case was whether the <u>Pearce</u> principle applied to bar the imposition of a higher sentence after a <u>de novo</u> trial in those jurisdictions that employ a two-tier system of trial courts. While noting that '[i]t may often be that

-27-

the [de novo "appeal" court] will impose a punishment more severe than that received from the inferior court,' id., at 117, we were shown nothing to persuade us that 'the hazard of being penalized for seeking a new trial, which underlay the holding of Pearce, also inheres in the de novo trial arrangement.' Id., at 116 (emphasis supplied). In short, the Due Process Clause was not violated because the 'possibility of vindictiveness' was not found to inhere in the two-tier system. Ibid.

"This case, then, is controlled by the inquiry into possible vindictiveness counseled by Pearce, Moon, and Colten. The potential for such abuse of the sentencing process by the jury is, we think, de minimis in a properly controlled retrial. The first prerequisite for the imposition of a retaliatory penalty is knowledge of the prior sentence. It has been conceded in this case that the jury was not informed of the prior sentence. We have no reason to suspect that this is not customary in a properly tried jury case. It is more likely that the jury will be aware that there was a prior trial, but it does not follow from this that the jury will know whether that trial was on the same charge, or whether it resulted in a conviction or mistrial. Other distinguishing factors between jury and judicial sentencing further diminish the possibility of impropriety in jury sentencing. As was true in Colten, the second sentence is not meted out by the same judicial authority whose handling of the prior trial was sufficiently unacceptable to have required a reversal of the conviction. Thus, the jury, unlike the judge who has been reversed, will have no personal stake in the prior conviction and no motivation to engage in self-vindication. Similarly, the jury is unlikely to be sensitive to the institutional interests that might occasion higher sentences by a judge desirous of discouraging what he regards as meritless appeals." (Emphasis added.) 412 U.S. at 25-27.

Finally, in Blackledge v. Perry (1974), 417 U.S. 21, 27, 94 S.Ct. 2098, 40 L.Ed.2d 628, the Supreme Court said,

"[t]he lesson that emerges from Pearce, Colten, and Chaffin is that the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'"

-28-

In defendant's case, the trial judge presiding at the original trial was replaced. The second sentence was not "meted out by the same judicial authority whose handling of the prior trial was sufficiently unacceptable to have required a reversal of the conviction." The Honorable Charles Luedke had "no personal stake in the prior conviction and no motivation to engage in self-vindication." Chaffin v. Stynchcombe, supra, 412 U.S. at 27. The Supreme Court has stated that unless threat of vindictiveness is a realistic likelihood, Pearce does not apply. Therefore, we conclude that Pearce does not apply in defendant's case because the District Court judge was replaced for the new trial and sentencing and he stated his reasons for imposing the death penalty on these charges with clarity.

Issue VI. Finally, defendant contends the death penalty may not be imposed in this case because the sentencing statutes in effect at the time of the crimes were unconstitutional, thereby rendering the death penalty nonexistent for those crimes. The argument arises because the District Court sentenced defendant to death for the crimes of deliberate homicide and aggravated kidnapping under the amended statutory provisions in effect at the time of trial. Defendant argues this procedure amounted to an unconstitutional ex post facto application of laws because he received a more severe sentence under the amended statutes than he could have possibly received under the previous statutes.

At the time of the crimes, section 94-5-105, R.C.M. 1947, the sentencing statute for deliberate homicide, stated:

> "94-5-105. Sentence of death for deliberate homicide. (1) When a defendant is convicted of the offense of deliberate homicide the court shall impose a sentence of death in the following circumstances, unless there are mitigating circumstances:
>
> "(a) The deliberate homicide was committed by a person serving a sentence of imprisonment in the state prison; or

-29-

"(b)  The defendant was previously convicted
of another deliberate homicide; or

"(c)  The deliberate homicide was committed by
means of torture; or

"(d)  The deliberate homicide was committed by
a person lying in wait or ambush; or

"(e)  The deliberate homicide was committed as
a part of a scheme or operation which, if
completed, would result in the death of more
than one person.

"(2)  Notwithstanding the provisions of sub-
section (1) and regardless of circumstances,
when a defendant is convicted of the offense
of deliberate homicide under subsection (1)(a)
of section 94-5-102 in which the victim was a
peace officer killed while performing his duty
the court shall impose a sentence of death."

This Court held in State v. McKenzie (1978), _____ Mont.

_____, 581 P.2d 1205, 35 St.Rep. 759, that section 94-5-

105, as it existed in January 1974, (which was identical to

the statute set forth above, except for subsection (2),

making imposition of the death penalty mandatory when the

defendant was convicted of deliberate homicide in which the

victim was a peace officer killed while performing his duty)

was constitutional on its face.  In McKenzie, we discussed

the three cases cited here by defendant--Woodson v. North

Carolina (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d

944; Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861,
                        and
53 L.Ed.2d 982--concluded that section 94-5-105 withstood

scrutiny under the Supreme Court decisions because it

allowed for consideration of mitigating circumstances.

However, defendant's argument concerning the penalty for

deliberate homicide fails to consider McKenzie and is there-

fore without merit.

At the time of the crimes, the sentencing statute for

aggravated kidnapping simply stated:

"94-5-304.  Sentence of death for aggravated
kidnapping.  A court shall impose the sentence
of death following conviction of aggravated
kidnapping if it finds that the victim is dead
as the result of the criminal conduct."

-30-

In State v. Coleman (1978), _____ Mont. _____, 579 P.2d 732, 35 St.Rep. 560, this Court found section 94-5-304 to be a mandatory death penalty statute and therefore unconstitutional on its face. Since Dewey Eugene Coleman had received the death penalty under the unconstitutional statute, we vacated the sentence and remanded the case to the District Court for resentencing. Coleman was subsequently resentenced to death under amended statutes sections 94-5-303(2) and 95-2206.6 through 95-2206.15, R.C.M. 1947, which required the District Court to consider aggravating and mitigating circumstances. On appeal, Coleman argued that the District Court's application of the amended statutes violated the constitutional prohibition against ex post facto laws. (See State v. Coleman (1979), _____ Mont. _____, _____ P.2d ____, 36 St.Rep. 1134. We held the District Court properly sentenced Coleman under the amended statutes because the amendments were ameliorative in nature and therefore did not deprive Coleman of a substantial right or immunity which he possessed at the time the crime was committed.

Defendant's argument concerning the application of the amended sentencing statutes for aggravated kidnapping is identical to the argument advanced by Coleman in his second appeal and is therefore controlled by our decision in that case. See our second opinion in Coleman (1979), _____ Mont. _____, _____ P.2d ____, 36 St.Rep. 1134; and our opinion on rehearing in Coleman, dated December 19, 1979.

Having found no error in the manner in which defendant's trial was conducted, nor error in the imposition of the death penalty for the crimes of deliberate homicide and aggravated kidnapping, we hereby affirm the judgment of the District Court.

SENTENCE REVIEW

Section 95-2206.12, R.C.M. 1947, now section 46-18-307 MCA directs this Court to review a sentence of death

-31-

whenever such is imposed by a District Court of this state.

Section 95-2206.15, R.C.M. 1947, now section 46-18-310 MCA sets forth the determinations we must make:

"Supreme court to make determination as to the sentence. The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:

"(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

"(2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 95-2206.8 and 95-2206.9; and

"(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration."

A review of the entire record reveals nothing that would indicate that the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor.

The District Court judge concluded that the crime of deliberate homicide had been "committed by a person lying in wait or ambush", which is an aggravating circumstance under section 95-2206.8(4), R.C.M. 1947, now section 46-18-303(4) MCA, and that the crime of aggravated kidnapping had "resulted in the death of the victim", which is an aggravating circumstance under section 95-2206.8(7), R.C.M. 1947, now section 46-18-303(7) MCA. Discussion of this point is unnecessary, except to state that the evidence in the record clearly proves sufficient aggravating circumstances exist in this case to warrant imposition of the death penalty.

No mitigating circumstances were found by the District Court judge which would call for leniency. Mitigating

-32-

circumstances are set forth in section 95-2206.9, R.C.M.
1947, now section 46-18-304 MCA:

"Mitigating circumstances. Mitigating cir-
cumstances are any of the following:

"(1)   The defendant has no significant
history of prior criminal activity.

"(2)   The offense was committed while the
defendant was under the influence of extreme
mental or emotional disturbance.

"(3)   The defendant acted under extreme duress
or under the substantial domination of another
person.

"(4)   The capacity of the defendant to appreciate
the criminality of his conduct or to conform his
conduct to the requirements of law was substantially
impaired.

"(5)   The victim was a participant in the defendant's
conduct or consented to the act.

"(6)   The defendant was an accomplice in an offense
committed by another person, and his participation
was relatively minor.

"(7)   The defendant, at the time of the commission
of the crime, was less than 18 years of age.

"(8)   Any other fact exists in mitigation of the
penalty."

The transcript of the sentencing proceeding reveals
defendant's significant criminal history.  That history is
similarly preserved in the District Court's findings:

"a.   On June 1, 1965, the defendant was charged
with assault in the second degree, involving alleged
grievous bodily injury upon one Larry Ruff.  This
case was dismissed eight months later at the
request of the county attorney for the reason
that the prosecuting witness could not be
located and the case could not be prosecuted
further without his testimony.  (State's Exhibit
68.)

"b.   On August 3rd, 1965, defendant was charged
in City Police Court with reckless driving and
leaving the scene of an accident.  After a jury
verdict of guilty, he appealed to the District
Court, which was later disposed of by a change
of plea to guilty and the payment of a fine.
(State's Exhibit 67.)

"c.   The defendant was found guilty of assault
in the second degree on September 13, 1966, in
Billings, Montana, wherein he shot LeRoy Gash
seven times in the upper part of the left leg

-33-

with an automatic pistol, receiving a sentence
of six years in the Montana State Prison.
(State's Exhibit 66.)

"d.   On July 28th, 1971, charges were filed in
the Yellowstone County District Court charging
the defendant, and others, with the crimes of
burglary and criminal possession of dangerous
drugs.   This cause was dismissed at the request
of the county attorney on the ground that 'he
(Fitzpatrick) has entered a plea of guilty to
another charge,' being the charge described in
paragraph following.   (State's Exhibit 64.)

"e.   On October 29th, 1971, defendant entered
a plea of guilty to a charge of assault in the
first degree and received a sentence of five
years in Montana State Prison.   On this occasion
the defendant invited one James Prince to step
out the back door of the Western Bar in Billings,
Montana, and once outside defendant shot Prince
in the face with an automatic pistol.   (State's
Exhibit 65.)

"f.   On February 28th, 1973, while confined in
the Montana State Prison, defendant was implicated
in the death of a fellow inmate, Alfred Falcon.
He was charged, tried and convicted of second-
degree murder, but this conviction was later set
aside on grounds that he had been deprived of
effective legal representation and a speedy trial.
The reversal of this conviction nullifies this
incident as evidence in aggravation, but is, never-
theless, material in demonstrating that the defendant's
conduct in prison is not a source of mitigation
with respect to the sentencing issue before the
Court.   (State's Exhibit 63.)

"g.   During the course of the trial of this cause
defendant admitted at his own instance that
immediately after his release from Montana State
Prison on March 28th, 1975, he began selling drugs
illegally in Butte, Montana, in flagrant violation
of the laws of this state."

None of the specific mitigating circumstances listed

under section 95-2206.9 exist in defendant's case, nor do

any other facts exist in mitigation of the penalty.   Therefore,

we uphold the District Court's finding on this point.

Finally, it must be determined whether the sentence of

death in the defendant's case is excessive or disproportionate

to the penalty imposed in similar cases.

As stated in Coleman, it has only been since 1973 that

the death penalty could be imposed for the crime of aggravated

kidnapping in which the victim is killed.   Consequently,

-34-

we are limited in our comparison of cases to an examination of McKenzie and Coleman, which are the only cases arising in Montana since the effective date of the aggravated kidnapping statute.

The defendant in McKenzie was charged with deliberate homicide and aggravated kidnapping as a result of the bludgeoning death of Lana Harding. The District Court imposed the death penalty for both offenses and this Court affirmed following remand from the United States Supreme Court. 581 P.2d at 1235. The victim was found draped over a grain drill; partially nude, with a rope tied around her neck, and severely beaten about the head and body. Death had been caused by severe blows inflicted by Duncan Peder McKenzie.

In Coleman, the defendant was sentenced to death following the jury's verdict of guilty of the crime of aggravated kidnapping. Dewey Eugene Coleman raped Peggy Harstad, beat her about the head with a motorcycle helmet, attempted to strangle her with a nylon rope, and finally held her in the Yellowstone River until she drowned.

We conclude that the sentence of death for aggravated kidnapping in the defendant's case was not excessive or disproportionate to the penalty imposed in similar cases.

Until January 1, 1974, the jury, or the District Court, if punishment was left to the court, had complete discretion in the sentencing of persons convicted of first degree murder. Ch. 513, §32, Laws of Montana (1973), codified as section 94-2505, R.C.M. 1947. Subsequently, this Court, in State v. Rhodes and Shields (1974), 164 Mont. 455, 524 P.2d 1095, declared that two death sentences imposed under section 94-2505 were unconstitutional and therefore invalid because the United States Supreme Court decision in Furman v. Georgia (1972),

-35-

408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, invalidated all death sentences imposed under statutes which lodged unfettered discretion in the judge.

A review of cases such as--State v. Rhodes and Shields, supra; State v. Hatfield (1973), 163 Mont. 248, 516 P.2d 368; and State v. Quigg (1970), 155 Mont. 119, 467 P.2d 692--reveals that the death penalty was indeed being imposed "wantonly and freakishly" in Montana. 408 U.S. at 310. This, the United States Supreme Court held in Furman, constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. As a result, cases in which the defendant was sentenced under section 94-2505 for the crime of first degree murder are not similar to the case on appeal, in which a constitutional sentencing procedure for the crime of deliberate homicide is involved.

Other cases similar to defendant's are: McKenzie, supra, and State v. Buckley (1976), 171 Mont. 238, 557 P.2d 283.

The facts in Coleman and McKenzie have been previously set forth. McKenzie was sentenced to die for the crime of deliberate homicide. We look at Buckley, although Buckley is really not similar because he was sentenced before the 1977 amendments regarding sentencing in capital cases were adopted.

In Buckley, a man named James A. McIntyre was staying at a cabin near Glen Lake, Montana, with the consent of the owner. Gary L. Buckley also received permission to stay at the cabin. However, McIntyre was never informed of this, and upon returning to the cabin on July 3, 1975, he was surprised to be met by Buckley. Believing Buckley to be on the premises unlawfully, McIntyre informed the local police. That night McIntyre returned to the cabin with a Lincoln County Sheriff's deputy in McIntyre's truck. The deputy was dressed in civilian clothes and carried a gun.

After failing to find Buckley, the men met with other law enforcement officers. The officers left the area, but McIntyre and a friend returned to the cabin, and according to Buckley, yelled threats to him to stay away or he would be harmed. Buckley observed all of these events from nearby where he was sleeping for the night because he feared for his life and believed McIntyre was out to get him.

The next day Buckley was reading a book in the cabin when he saw McIntyre's truck approach. The truck went slowly past the cabin and stopped 15 to 20 yards away from it. Buckley, sensing danger, picked up his gun, and went to the door. As he went past the refrigerator, Buckley heard a noise behind him. As he turned, he saw McIntyre holding a rifle waist high. McIntyre leveled the rifle and shot at Buckley, missing him. Buckley fired back, and missed McIntyre. McIntyre began running to his truck, and Buckley continued shooting, wounding McIntyre, knocking him to the ground and causing him to drop the rifle. Buckley continued to walk toward McIntyre, who was lying still at the time, and continued shooting, hitting McIntyre two more times and from less than seven and one-half feet away. Finally, Buckley knelt down and delivered the fatal shot to McIntyre's head from less than a foot away.

Buckley was convicted of deliberate homicide and sentenced to 100 years in prison. His sentencing occurred before the passage of section 46-18-301 through -310 MCA, relating to the death penalty, under which Fitzpatrick was sentenced. However it does not appear that Buckley's crime, serious as it was, included any of the aggravating circumstances triggering the death penalty under section 46-18-303 MCA.

We conclude that the sentence of death for deliberate homicide in defendant's case was not excessive or disproportionate to the penalty imposed in similar cases.

ADDENDUM

After the hearing before this Court on this second appeal of Fitzpatrick, and before we promulgated our opinion, the decision came down from the United States Supreme Court in Sandstrom v. Montana (1979), _____U.S. _____, 99 S.Ct. 2450, 61 L.Ed.2d 39. In Sandstrom, the United States Supreme Court found the trial court's instruction "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" unconstitutional. ____ U.S. ___ at ____, 99 S.Ct. at 2454, 61 L.Ed.2d at 45.

Because of the possibility that Sandstrom might have had an implication for this case, we ordered a further hearing in Fitzpatrick, limited to the issues, if any, which had been raised by virtue of the Sandstrom opinion. These additional limited issues were briefed by counsel for the State and for the defendant Fitzpatrick, and hearing thereon was had before this Court on October 30, 1979.

We now determine that the instructions given in this Fitzpatrick case on the second trial have no Sandstrom implications.

In the second Fitzpatrick trial, the trial court gave as its instruction no. 13, the following:

> "You are instructed that 'knowingly' or 'purposely' may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear and thus be able to give direct evidence of what a defendant does or fails to do, there can be no eye witness account of the state of mind with which the acts were done or omitted. But what a defendant does or fails to do may indicate that he 'knowingly' or 'purposely' committed the offense or offenses charged.
>
> "It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done, knowingly omitted, purposely done, or purposely omitted. So unless the contrary appears from the evidence, the jury may draw the inference that the defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done, knowingly omitted, purposely done or purposely omitted.

-38-

"In determining the issue as to 'knowingly' or 'purposely' the jury is entitled to consider any statements made and acts done or omitted by the defendant, and all facts and circumstances in evidence which may aid in the determination of the state of mind of the defendant."

At the outset we note an important difference between the Fitzpatrick instruction and the instruction given in Sandstrom. The Fitzpatrick instruction is entirely permissive whereas it was the opinion of the United States Supreme Court in Sandstrom that the instruction there involved was mandatory. Moreover, in the Fitzpatrick instruction, it appears from the face thereof that the connection between the inference which the jury is permitted to draw and the proven facts upon which the inference must be based is both reasonable and logical. See, for comparision, a similar instruction, but differently phrased in our second opinion on State v. Coleman, promulgated December 19, 1979.

In weighing whether the instruction of Fitzpatrick has any impermissible unconstitutional effect, it is pertinent to look at the language of the United States Supreme Court in County of Ulster City v. Allen (1979), _____ U.S. ____, 99 S.Ct. 2213, ____ L.Ed.2d ____:

"Inferences and presumptions are a staple of our adversarial system of fact-finding. It is often necessary for the trier of fact to determine the existence of an element of the crime--that is, an 'ultimate' or 'elemental' fact--from the existence of one or more 'evidentiary' or 'basic' facts. (Citing authority.) The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the fact finder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the fact finder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. (Citing cases.)

-39-

The most common evidentiary device is the entirely permissive inference or presumption, which allows-- but does not require--the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant. (Citing a case.) In that situation the basic fact may constitute prima facie evidence of the elemental fact. (Citing authority.) When reviewing this type of device, the Court has required the party challenging it to demonstrate its invalidity as applied to him. (Citing authority.) Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational fact finder to make an erroneous factual determination." 99 S.Ct. at 2224.

Under the Allen language foregoing, we examine the Fitzpatrick instruction as it was given. Plainly, the instruction does not curtail in any way the jury's duty and freedom to assess the evidence independently. Under the instruction the jury is free to credit or reject the inference.

The defendant is not required to come forward with evidence to overcome the permitted inference. Under this instruction and other instructions given by the court, the duty remains upon the State to prove every element of the crimes charged against Fitzpatrick beyond a reasonable doubt. The Fitzpatrick instruction, therefore, meets the first test under Allen, because the jury is free to accept or reject the instruction and no additional burden is placed on the defendant as far as coming forward with proof is concerned.

The second test under Allen is the application of the instruction to the "beyond a reasonable doubt" standard. This test is met by the instruction unless under the facts of the case there is no rational way that the jury could make the connection permitted by the inference. It is clear from the evidence in this case that it is perfectly rational

-40-

to infer that Fitzpatrick committed this crime knowingly or purposely, and thus the instruction meets the second Allen test.

A few items of the evidence that connect Fitzpatrick with the crime on which the jury could infer, if need be, that Fitzpatrick committed the crime knowingly and purposely are these: the body of Monte Dyckman itself; the fact that Fitzpatrick went to a house in Billings to get a handgun; the fact that he later displayed the handgun and cautioned others to be careful with it because it was loaded; his otherwise unexplained trip from Billings to Hardin, Montana; the ski mask which was found at the scene of the crime and which was connected with Fitzpatrick; the spent casing from a handgun which was found in the Monte Dyckman car after the body was discovered; the bits of rope which were used to tie up the victim; the hole in the windshield where it was testified that Fitzpatrick's gun was fired; the flight by Fitzpatrick in the early morning hours to Butte with Christine Fetters; hiding the handgun; and Radi's statement that Fitzpatrick "shot his head off". It is further stated by the United States Supreme Court in Allen that the rational connection between the basic facts at the prosecution proved and the ultimate fact which the jury is permitted to presume is valid if it is "more likely than not to flow from" the basic facts proved. Allen, 99 S.Ct. at 2228.

It is noteworthy that the decision by the United States Supreme Court in Allen, was/issued on June 4, 1979 and that Sandstrom was/issued on June 18, 1979. The closeness in time of these two decisions indicates that in determining the validity of an instruction such as that given in Fitzpatrick, it is proper to weigh not only the consequences flowing from the mandatory instruction given in Sandstrom, but also the

-41-

consequences flowing from permissive instructions as described in Allen. The language used by the United States Supreme Court in Allen is apropos to the Fitzpatrick case. In any event, however, the disputed instruction meets the test derived from Sandstrom, because this instruction does not invade the fact-finding duty of the jury nor allocate the burden of proof between the defendant and the State. See the discussion on the effect of Sandstrom in Holloway v. McElroy (D. Ga. 1979), 474 F.Supp. 1363-68.

## DISPOSITION

The judgment of the District Court is affirmed and this cause is remanded to the District Court of the Thirteenth Judicial District of the State of Montana in and for the County of Yellowstone for the purpose of resetting the execution date of the defendant Bernard James Fitzpatrick.

_____
                  Justice

We Concur:

_____
       Chief Justice

_____

_____
       Justices

Mr. Justice Daniel J. Shea will file his written dissent
at a later date.

IN THE SUPREME COURT FOR THE STATE OF MONTANA

---

No. 14422

---

1980

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

BERNARD JAMES FITZPATRICK,

Defendant and Appellant.

---

DISSENT

MR. JUSTICE DANIEL J. SHEA

---

FILED

FEB 21 1980

*Thomas J. Kearney*

CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea affirms the convictions but dissents to the imposition of the death penalties in this case.

Concerning the Sandstrom-type instruction given in this case, I agree for the most part with the majority analysis. As the opinion makes clear, the instruction given in this case was not a carbon copy of that given in Sandstrom. Furthermore, I emphasize here, as I did in State v. Coleman (1979), ____ Mont. ____, _____ P.2d ____, 36 St.Rep. 2237, that the facts of this case are radically different from those existing in Sandstrom. Here, as in Coleman, the defense was alibi. The jury had a choice of either believing Fitzpatrick's alibi, or not believing it. The jury chose not to believe it. In Coleman, there was direct evidence by accomplice Nank that defendant Coleman participated in the kidnapping, rape and homicide. Here, the evidence is more indirect in that there is no eyewitness testimony to the crime itself. Nonetheless, once the jury chose not to believe the alibi of defendant Fitzpatrick, there was abundant evidence by which it could convict him of the crimes charged. A Sandstrom-type instruction would not have aided the State's case in this regard.

I. THE BACKGROUND OF THE DEATH PENALTY MORASS:

The defendant has become ensnared in a death penalty morass that has gone far past nightmarish proportions. The legal quagmire can perhaps be best understood if the background of the death penalty problem is set forth in relation to the first appeal and then to the present appeal.

Defendant Fitzpatrick, along with Gary Radi, Travis Holliday, and Paul Bad Horse, were charged with robbery, aggravated kidnapping, and deliberate homicide. The victim was Monte Dyckman, and the crimes were committed on April 5, 1975. Defendants Fitzpatrick and Radi were convicted on all three counts. Defendants Holliday and Bad Horse were convicted of robbery only. Sentencing

-43-

of defendants Fitzpatrick and Radi for the crimes of aggravated kidnapping and deliberate homicide, raised the specter of the death penalty.

By the time of the sentencing hearing, the United States Supreme Court had already ruled that the death penalty was not per se unconstitutional. But there was great confusion to what kind of death penalty statutes would meet the approval of the Supreme Court. One extreme, and apparently the one taken by the legislature which had passed the death penalty laws involved in this case at the first sentencing, was that only a mandatory death penalty scheme would pass constitutional muster. The belief apparently was that only then could a statute eliminate the doubt attendant upon the surrounding of exercise of discretion in the decision of whether or not to impose the death penalty. Obviously, if the death penalty was mandatory, there would be no discretion at all.

It was also the position of the first sentencing judge that only the mandatory death penalty would pass constitutional muster. For this reason, however, a dilemma existed in relation to the deliberate homicide penalty. For some reason, the legislature had overlooked the deliberate homicide statute in changing the statutes, and the death penalty was not mandatory. Section 94-5-105, R.C.M. 1947, provided the death penalty for deliberate homicide "unless there are mitigating circumstances." Thus, the qualifying phrase prevented the deliberate homicide penalty from qualifying as a mandatory death penalty statute. On the other hand, the aggravated kidnapping statute, section 94-5-304, R.C.M. 1947 explicitly mandated the death penalty if the victim was dead as a result of the kidnapping. This was the statutory picture at the time the penalties were imposed by the first sentencing judge.

-44-

Defendants Fitzpatrick and Radi were sentenced on each of the three counts. For robbery, each was sentenced to 100 years in prison (each had been found to be a persistent felony offender); for deliberate homicide (apparently because the sentencing judge thought the statute to be unconstitutional because it was not mandatory) each was sentenced to 100 years in prison; and for aggravated kidnapping, each was given the death penalty. Defendants Holliday and Bad Horse were each sentenced to 40 years in prison for the crime of robbery. All the defendants appealed from the convictions.

In State v. Fitzpatrick (1977), ____ Mont. ___, 569 P.2d 383 , 34 St.Rep. 736 , this Court ruled that it was prejudicial error to try all the defendants jointly under the particular factual circumstances of the case, and we reversed all convictions. We ordered new and separate trials for each of them. We thus did not reach the death penalty arguments raised by Fitzpatrick and Radi in their first appeal simply because our reversal of the convictions did not require us to determine the death penalty issues.

As events would later prove, however, the first sentencing judge did not accurately assess the constitutional picture. In State v. Coleman (1977), 171 Mont. 278, 557 P.2d 1023, this Court, because of the United States Supreme Court decision, declared the mandatory death penalty for aggravated kidnapping to be unconstitutional. On the other hand, in State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, this Court upheld the constitutionality of the deliberate homicide statute, apparently for the reason that the qualifying words "unless there are mitigating circumstances" saved it from being designated as a mandatory death penalty statute.

Now to the results of the new trials where each of the defendants was tried separately. Two of the defendants were

-45-

again convicted of robbery and their convictions were affirmed by this Court. State v. Holliday (1979), ____ Mont. ____, 598 P.2d 113$; State v. Bad Horse (1980), ____ Mont. ____, ____ P.2d 36 St.Rep. 1535 ____, 37 St.Rep. 45 . Defendant Radi was acquitted on all charges. Fitzpatrick was again convicted on all three counts, and again the death penalty became an issue at sentencing.

Fitzpatrick was sentenced to 100 years in prison for robbery because he was found to be a persistent felony offender. But he was ensnared in a double bind in relation to the convictions on the count of aggravated kidnapping and the count of deliberate homicide. At the first sentencing defendant was sentenced to death under the mandatory statutory provision then existing. By the time of the second sentencing however, we had ruled in State v. Coleman, supra, that the mandatory death penalty was unconstitutional. The sentencing judge resolved this little problem by retroactively applying the 1977 death penalty statutes to the crimes committed in 1975. In the process of enacting the 1977 death penalty statutes, the legislature had also repealed section 94-5-304, which called for the mandatory death penalty for aggravated kidnapping. Ch. 338, §16, Laws of Montana (1977).

The sentencing court made this retroactive application of the law ostensibly under the rationale of and authority conferred by the United States Supreme Court in Dobbert v. Florida (1977), 432 U.S. 282, 92 S.Ct. 2290, 53 L.Ed.2d 344, which held that retroactive application of death penalty statutes does not violate the ex post facto clause of the United States Constitution if the statutes are construed as being procedural or "ameliorative" in nature. In a brief filed with the sentencing court, the Attorney General's Office also urged the sentencing court to retroactively apply the 1977 statutes to the crimes committed in 1975. By this decision, the Supreme Court apparently ruled that a defendant has no constitutional argument and cannot thus complain

-46-

if a court should determine that the statutes were designed for his benefit rather than for his demise, even though he meets his demise by an application of the statutes. Needless to say, the sentencing court was not to be denied; it retroactively applied the 1977 statutes and sentenced the defendant to death for the crime of aggravated kidnapping.

Subsequent to the decision of the sentencing court to retroactively apply the 1977 death penalty statutes, this Court approved of just such a scheme in the second Coleman case, State v. Coleman (1979), ___ Mont. ____, ____ P.2d ___, 36 St.Rep. 1134. There, as here, I lodged a whispering in the wind dissent to this unjust and inhumane interpretation of ex post facto laws.

The second part of the double bind relates to the possible penalty for deliberate homicide. The first sentencing judge had sentenced defendant to 100 years in prison for this crime, and the second sentencing judge had to confront this fact. In order to go beyond what the first sentencing court did, two hurdles had to be crossed. First the sentencing court had to comply with North Carolina v. Pearce (1969), 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656, which sets forth strict standards before a punishment can be increased after a second trial. Second, the sentencing court, in deciding to apply the 1977 death penalty statutes to the 1975 crimes, had to find a statutory aggravating circumstance existing under section 94-2206.8, R.C.M. 1947, now section 45-18-303, MCA, before the death penalty could be imposed.

Needless to say, the sentencing court ruled that it had complied with Pearce and that a statutory aggravating circumstance existed under section 45-18-303, and thus imposed the death penalty for deliberate homicide. A large portion of my dissent will be devoted to a demonstration that the sentencing court not only failed to comply with the standards imposed by Pearce,

-47-

but worse than this, the sentencing court and the majority opinion here totally nullified the Pearce standards. Furthermore, it is equally apparent that the facts of the deliberate homicide do not justify a determination that an aggravating circumstance exists under section 45-18-303, MCA.

SCOPE OF DISSENT:

Defendant's contention that the 1977 death penalty statutes were unconstitutionally applied to the 1975 crimes has, unfortunately, already been decided against him in the second Coleman case, supra. I dissented to the majority opinion in this regard and my dissent in Coleman shall also constitute my dissent here. _____ P.2d ____-____, 36 St.Rep. 1157A-1157QQ.

I raise in this dissent however, an entirely different issue in respect to the sentencing judge's decision to apply the 1977 death penalty statutes to the 1975 crimes. This point was not raised in the second Coleman case, and it has not been raised here. I believe if the majority of this Court is to remain consistent, that the statutory sentencing scheme in effect and approved in State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, should also have been applied here. This would, of course, have obviated any need to apply the 1977 death penalty statutes to the 1975 crimes. In short, if the statutory scheme passed constitutional muster in McKenzie, there is no reason why it should not have also been applied here. Failure to apply this scheme has prejudiced the rights of Fitzpatrick. I set forth my position in this regard in part II of this dissent.

Defendant also contends that the sentencing judge, when he increased the sentence for deliberate homicide from 100 years in prison to the death penalty, failed to comply with the objective standards set forth in Pearce, supra. I agree; but more than this, I believe that fundamental due process of law

-48-

should prohibit an increase of punishment after the second trial to that of death. My position in this regard is set forth in part III of this dissent.

The majority has taken the position that the sentencing court complied with all standards as set forth in Pearce. In fact, there was absolutely no compliance by the sentencing court with the standards set forth in Pearce. Since, however, the majority has totally obliterated the standards set forth in Pearce, I must necessarily demonstrate the havoc that has been wreaked by the majority opinion by the failure to apply Pearce. This analysis is set forth in part IV of this dissent.

The final part of my dissent concerns the failure of this Court to determine whether or not a statutory aggravating circumstance under section 95-2206.8, R.C.M. 1947, now section 46-18-303, MCA, existed for the imposition of the death penalty for the crime of deliberate homicide. It is clear that a statutory aggravating circumstance did not exist, and thus that the death penalty could not be imposed for the crime of deliberate homicide. The majority opinion has totally neglected to discuss this issue, even though one of the duties of mandatory review imposed by section 46-18-310, MCA, requires this Court to determine whether or not there existed a statutory aggravating circumstance. This analysis is set forth in part V of this dissent.

II. IT WAS ERROR FOR THE SENTENCING COURT TO APPLY THE 1977 DEATH PENALTY STATUTES TO CRIMES COMMITTED IN 1975.

In 1976, this Court decided the case of State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023. In that case the Court upheld the constitutionality of the statutory sentencing scheme as against an attack that the sentencing statutes and appellate review statutes were

-49-

constitutionally deficient. The statutes involved in that case were in existence before the commission of the crimes in March 1975; they were in existence at the time of the first sentencing; at the time of the second sentencing, and, as a matter of fact, they are still in effect today. One may logically ask then, if these statutes passed constitutional muster in McKenzie, why then were they not also applied in the second Coleman case, supra, and in the present case?

Although the second McKenzie case was not decided at the time either Coleman or Fitzpatrick were sentenced for the second time, nonetheless the majority opinion again confirmed the constitutionality of the statutory sentencing scheme then in existence. State v. McKenzie (1978), ___ Mont. ___, 581 P.2d 1205, 35 St.Rep. 759. If statutes already in existence at the time of the crime had passed constitutional muster, and were still in existence at the time of the second sentencing of both Coleman and Fitzpatrick here, what right did the sentencing courts have in choosing instead to use the 1977 statutes and apply them retroactively?

Retroactive application of the 1977 death penalty statutes is important for two reasons in the case of aggravated kidnapping and important for one reason in the case of deliberate homicide. Retroactive application of the 1977 death penalty statutes was the only way Dewey Coleman could be reached to impose the death penalty for aggravated kidnapping; and likewise, the same is true in the case of the death penalty imposed on Fitzpatrick for the crime of aggravated kidnapping.

If the sentencing court applied the sentencing statutes held constitutional in McKenzie, it would still have been confronted with section 94-5-304, R.C.M. 1947:

-50-

"A court shall impose the sentence of death
following conviction of aggravated kidnapping
if he finds that the victim is dead as the
result of the criminal conduct."

Since the death penalty was mandatory, and since this mandatory
death penalty has been declared unconstitutional in the first
Coleman case, there would have been no legal way to again impose
the death penalty. But application of the 1977 death penalty
statutes provided an out. In enacting a new scheme of aggravating
and mitigating circumstances, the 1977 legislature also in the same
process repealed section 94-5-304. Ch. 338, §16, Laws of Montana
(1977). The repeal of the mandatory death penalty by the 1977
legislature freed the sentencing court to impose the death penalty
for aggravated kidnapping by use of the guidelines set forth in
the new 1977 death penalty statutes.

In retroactively applying the 1977 death penalty statutes,
the sentencing court in the second Coleman case, and the sentencing
court here, relied on the State's argument that Dobbert, supra,
permitted the application of the 1977 death penalty statutes to
the crimes committed in 1975. But the sentencing court in Coleman,
and the sentencing court here failed to recognize that this Court
in McKenzie had already upheld a statutory system and method of
imposing the death penalty. Clearly, therefore, there was no
need to use the 1977 statutes, if the statutes in effect at the
time of the commission of the crimes had already passed con-
stitutional muster in McKenzie.

On the other hand, Dobbert does not involve a situation
where the statutes in effect at the time of the commission of
the crime had already passed constitutional muster. It would
thus appear obvious that the statutes approved in McKenzie,
should have been the statutes used in this case at the second
sentencing hearing for both Coleman, and for Fitzpatrick.

The argument can, of course, be made that the sentencing
court would have sentenced defendant to death regardless of

whether it used the statutory guidelines approved in McKenzie, or the 1977 death penalty statutes. If the sentencing court had not relied on the 1977 legislative repeal of the mandatory death penalty for aggravated kidnapping, it could not have imposed the death penalty at all for that crime. Thus being barred for constitutional reasons, it would then have had to rely exclusively on the provisions of the deliberate homicide statute which was saved from constitutional death by the savings clause at the end, "unless there are mitigating circumstances."

The phrase "unless there are mitigating circumstances" did not hamstring a sentencing court in determining what factors it chose to consider as being mitigating circumstances. On the other hand, the mitigating circumstances statute in the 1977 statutes, set forth a list of mitigating circumstances. Section 95-2206.9, R.C.M. 1947, now 46-18-304, MCA. Thus the sentencing court was compelled to follow the list when it sentenced defendant, and after it found no mitigating circumstances under the list, it was, of course, under considerable pressure to impose the death penalty.

Furthermore, section 95-2206.10, R.C.M. 1947, now 46-18-305, MCA, imposes considerably more pressure to assess the death penalty. It requires the death penalty to be imposed if the sentencing court finds "one or more of the aggravating circumstances and find that there are no mitigating circumstances sufficiently substantial to call for leniency." The mitigating circumstances in relation to the deliberate homicide statute, on the other hand, did not require that they be "sufficiently substantial to call for leniency." The only requirement was the presence of "mitigating circumstances," without regard to how substantial they may have been.

Under these circumstances, I believe that Fitzpatrick was clearly prejudiced by the decision of the sentencing court to

-52-

use and apply the 1977 death penalty statutes to his case.
It is more than a trifle inconsistent for the majority to
have upheld the statutory sentencing scheme in McKenzie and
then not insist that the statutes be applied to this case.

III. A SENTENCING FUNCTION THAT ESPOUSES FUNDAMENTAL FAIRNESS
WILL NOT TOLERATE THE ESCALATION IN PUNISHMENT AFTER A SECOND
TRIAL TO THAT OF DEATH.

In permitting the sentencing court to escalate the punish-
ment after the second trial to the death penalty, the majority
overlooked the fundamental unfairness inherent in such decision.
No judicial system espousing principles of due process of law
should tolerate a result where the price exacted for the exercise
of a constitutional right to a fair trial is death itself.

The general issue of whether the punishment can be increased
after a second trial has been extensively litigated. 12 A.L.R.3d
978 (1966). Indeed, it would appear that the results were so
diverse in the federal circuits as well as in the state courts,
that the United States Supreme Court finally decided the issue
in North Carolina v. Pearce (1969), 395 U.S. 711, 89 S.Ct. 2072,
23 L.Ed.2d 656. Although the Supreme Court held that the
practice does not violate the double jeopardy or equal protection
clauses, it did recognize the potential evils engendered by
such a practice and therefore set forth objective standards
which the sentencing court must follow in any decision increasing
the punishment. Neither Pearce, nor its two companion cases
also decided at the same time, involved an increase of punish-
ment to that of death.

Conceptually, at least, the issue of increasing the
punishment the second time around to that of capital punishment,
is no different from that of simply increasing the imprisonment
the second time around, or increasing a fine the second time
around. That would appear to be the position the United States

-53-

Supreme Court took in <u>Pearce</u>, when it held that increasing

a prison sentence was not a violation of the double jeopardy

or /protection clauses.  The Court cited Stroud v. United
   equal

States (1919), 157 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 in reaching

its decision.  In <u>Stroud</u>, the Supreme Court rather summarily

brushed aside a contention that the double jeopardy provision

prevented a defendant from receiving the death penalty after

he has secured a reversal of his first conviction which had

imposed a life sentence.  <u>Stroud</u> did not however, decide the due

process question.  Whether the Supreme Court would today still

apply <u>Stroud</u> to a situation where the ante has been raised to

one of capital punishment, is a question crying for an answer.

Disregarding the unspeakable dilemma of a defendant facing

the prospect of a death sentence the second time around as the

price of having successfully attacked his first conviction,

the underlying rationale supporting an increased sentence is

no different in a capital case than in a noncapital case.  In

jurisdictions permitting a higher sentence the second time

around, at least three reasons have been advanced in support

of this position.  First, that the defendant in obtaining a

new trial after the conviction of a crime assumes the risk of

a more severe sentence that was first imposed should he again

be reconvicted of that crime.  12 A.L.R.3d at 981.  Second, that

a defendant who invoked the action of an appellate court in

order to reverse a conviction cannot complain on <u>double jeopardy</u>

grounds that his sentence cannot be increased if he is convicted

again after a second trial.  12 A.L.R.3d at 982.  The annotation

in this regard, cites <u>Stroud</u>, supra, as authority for this

position.  Third, that as long as the defendant is not convicted

of a higher degree of crime, the second time around, an increase

of <u>punishment</u> does not constitute double jeopardy.  12 A.L.R.3d

at 982.

Needless to say, there are strong counter-arguments. One view reasons that the potential for a higher punishment after a second trial subjects a defendant to an unconscionable burden to pay as the price for having exercised his constitutional right to a fair trial by appealing his first conviction. 12 A.L.R.3d at 985. This position is illustrated by State v. Wolf (1966), 46 N.J. 301, 216 A.2d 586; 12 A.L.R.3d 970. Wolf involved a potential death penalty should the defendant be convicted at his second trial.

Another view is that an increase in punishment after a second trial does constitute double jeopardy. 12 A.L.R.3d at 984. This view, insofar as the federal constitution is concerned, was effectively nullified by the majority opinion in Pearce, supra. Now such a view would hold only if a state court invoked the double jeopardy clause of its own state constitution.

A third approach, and one reached after the decision in Pearce, is that taken by the Alaska Supreme Court in Shagloak v. State (Alaska 1969), 597 P.2d 142. The Court flatly held that a greater punishment after a second trial violates the due process clause of the Alaska Constitution.

The determination that the courts must not be a party to a process which exacts such a horrible price from a defendant when he exercises his rights by appealing his first conviction, is essentially grounded on due process considerations. As a matter of judicial policy, this position is even more compelling where the greater punishment after the second trial may be the death penalty. Because capital punishment is a price too high to pay for having successfully attacked a first conviction, several state courts have wisely eliminated the possibility that such a horrible dilemma might be a recurring reality.

The case of People v. Henderson (1963), 60 Cal.2d 482, 386 P.2d 677, preceded State v. Wolf, supra, in holding that a

-55-

defendant convicted of first degree murder and given a
life sentence, could not, upon a second trial be subjected
to the death penalty.  The California Supreme Court ruled
that the double jeopardy provision intervened to prevent the
imposition of a death penalty.  In so reasoning, the Court
took the liberty of concluding that Stroud v. United States,
supra, had been vitiated by Green v. United States, supra, thus
concluding that the price to be paid by Henderson in exercising
his right to appeal his conviction was too high if he could
be subjected to a death penalty upon a retrial.  The Court,
however, couched its reasoning more in a due process analysis:

> ". . . A defendant's right to appeal from an
> erroneous judgment is unreasonably impaired
> when he is required to risk his life to invoke
> that right.  Since the state has no interest
> in preserving erroneous judgments, it has no
> interest in foreclosing appeals therefrom by imposing
> unreasonable conditions on the right to appeal."
> 386 P.2d at 686.

In People v. Ali (1967), 66 Cal.2d 277, 424 P.2d 932, the
California Supreme Court extended the Henderson rationale
to apply to any increase in sentence after a second trial.

The New Jersey Supreme Court, in State v. Wolf, supra,
deliberately avoided grounding its decision on the double
jeopardy clause of the United States Constitution.  Although
the court agreed with the rationale in Henderson, supra, it
was not as certain that the United States Supreme Court would
agree that the "grisly choice" faced by such a defendant was
sufficiently alarming to cause the Supreme Court to bar the
practice of increasing the punishment after the second trial.
Instead, the New Jersey Supreme Court declared that fundamental
fairness in the administration of the court system would not
tolerate such an unjust result:

> "Traditionally appellate courts have exercised a
> greater degree of caution in dealing with capital
> cases, and they have shown special concern over

procedures which interfere with the right of appeal. In this case the prosecutor's thesis endangers a vital societal principle, that no person shall be deprived of his life or liberty except by a trial free from prejudicial error. Awareness of that principle naturally stimulates judicial reluctance to see the price of an appeal set at the risk of a man's life. Such a price, in our judgment, is a hardship so acute and so shocking that our public policy cannot tolerate it. Consequently, we hold that since the State has granted the universal right of appeal, standards of procedural fairness forbid limiting the right by requiring the defendant to barter with his life for the opportunity of exercising it." 216 A.2d at 590.

The State argued in Wolf that the threat of a death

penalty to a defendant should he successfully attack his first

conviction, fosters a beneficial institutional interest of the

courts by deterring the number of appeals. To this the New

Jersey Supreme Court responded:

". . . In a choice between forcing the defendant either to surrender his right to an error-free trial as well as his right of appeal, and to accept the life imprisonment sentence, or to put his life at stake again on retrial following a successful appeal, justice can follow only one course. That course is the one demanded by procedural fairness and principles of public policy, namely, prohibition of such a fearsome election, and the restriction of available punishment at a new trial to life imprisonment, if a second conviction results. (Citing cases.) Otherwise, a defendant with perfect grounds of appeal may be deterred from seeking appellate review just the same as one whose appeal rests entirely on frivolous grounds." 591 A.2d at 591.

Although the New Jersey Supreme Court deliberately avoided

a direct due process ruling, the essence of its decision rests

upon fundamental fairness, the essential ingredient of due

process of law.

These same policy considerations expressed in Wolf, are

expressed in decisions of the Oregon, Minnesota and Alaska

Supreme Courts.

The Oregon Supreme Court exhaustively discussed the pros

and cons of the cases addressing the issue of increasing the

-57-

penalty after a second trial, and then concluded that the risk of increased punishment is a price that should not be exacted by the judicial system. State v. Turner (1967), 247 Or. 301, 429 P.2d 565. On the basis of public policy the Court adopted the following rule:

> "We believe that the interest of the public and the individual can best be served by the following rule: After an appeal or post-conviction proceeding has resulted in the ordering of a retrial for errors other than an erroneous sentence, such as in the Froembling cases, and the defendant has again been convicted, no harsher sentence can be given than that initially imposed. If the initial sentence was incarceration, the defendant subsequently cannot be sentenced to any longer term than the time still to be served upon his initial sentence." 429 P.2d at 570-571.

The Oregon Supreme Court, however, following the lead of the New Jersey Supreme Court, expressly declined to decide the case on a constitutional ground. The Court quoted extensively from Wolf, supra, and then stated the ground upon which it rested its decision:

> "There also remains the issue of whether the rule proposed should be grounded upon the due process or double jeopardy provisions of the state or federal constitutions or whether it should be grounded upon the statutes or the common law."

> "We do not find it necessary to decide the constitutional issues as we conclude that when the state grants a criminal appeal as a matter of right to one convicted of a crime, as it has, our procedural policy should be not to limit that right by requiring the defendant to risk a more severe sentence in order to exercise that right of appeal. ORS 138.020." 429 P.2d 571.

The Minnesota Supreme Court, in State v. Holmes (1968), 161 N.W.2d 650, also examined the cases pro and con and recognized that the federal and state courts were hopelessly divided. The Court ruled, however, that it is contrary to public policy to permit increased punishment after a second trial, for it discourages a defendant from exercising his legal rights. The court held:

-58-

". . . The third approach, and the one which
we adopt, precludes inquiry into the motives
of the sentencing judge and holds as a matter
of law that any increase in penalty upon a retrial
inevitably discourages a convicted defendant from
exercising his legal rights and is contrary to
public policy. Except for convictions resulting
from Federal offenses, the Federal courts have been
obliged to base their decisions on constitutional
grounds, which we decline to do." 161 N.W.2d at
653.

The Alaska Supreme Court, by invoking its own due process

clause, flatly rejected the rule set forth in Pearce, supra.

Shagloak v. State (Alaska 1979), 597 P.2d 142. In holding

that a greater punishment after a second trial violates the

due process clause of the Alaska Constitution, the Court stated:

"We believe if a more severe sentence may be imposed
after retrial for any reason, there will always be
a definite apprehension on the part of the accused
that a heavier sentence may be imposed. Such
apprehension or fear would place the defendant in
an 'incredible dilemma' in considering whether to
appeal the conviction. A 'desparate' choice exists,
and may very well deter a defendant from exercising
the right to assert his innocence and request a
retrial. Such deterrence violates the due process
clause of the Alaska Constitution. The fundamental
standard of procedural fairness, which is the basic
due process right claimed in this case, forbids placing
a limitation on the defendant's right to a fair trial
by requiring a defendant to barter with freedom for
the opportunity of exercising it. See State v. Wolf,
46 N.J. 301, 206 A.2d 586, 590-591, 12 A.L.R.3d 970,
976 (1966). The state has no valid interest in
imposing unreasonable conditions on Shagloak's
legitimate exercise of his due process right. The
imposition of the five-year sentence after his trial
following the change of plea from guilty to not
guilty was a denial of due process of law under the
Alaska Constitution and cannot be countenanced by this
court." 597 P.2d at 145.

Beyond these compelling policy considerations in favor

of adopting a strict rule prohibiting an increase in punishment

after a second trial under any circumstances, the question arises

as to whether the judicial system is capable of effectively

reviewing an increased sentence imposed after a second trial.

The standards set forth by the United States Supreme Court

in Pearce, supra, no doubt were designed with this problem

in mind. But notwithstanding these standards, the fact remains that vindictiveness of a sentencing judge is something that can rarely be demonstrated by the cold record.

A sentencing judge will certainly not admit to a character trait of vindictiveness. Furthermore, a truly vindictive judge will be careful enough to leave no tracks in the sentencing record as to the true basis of his decision. Only in the most flagrant cases can vindictiveness be demonstrated by the cold record. Thus, as a practical matter it becomes almost impossible from the cold sentencing record to isolate and identify vindictiveness as the impelling motive. The record of review consists of only what the sentencing court wants to supply for public consumption and the review of the appellate court.

The inherent defects of this situation are not cured at all by the performance of lawyers in presenting a case for review, or by a review court in reviewing the case. As a general rule, lawyers are most unwilling to venture into a judicial political thicket with any kind of zeal, regardless of the merits of the case. Nor are appellate judges willing to undertake the kind of review that is needed. Indeed, an appellate court has a distinct reluctance to categorize the decision of the sentencing judge as vindictive, even though the appellation may be abundantly deserved.

Place all these factors into the same judicial pot and it is immediately apparent that effective appellate review is institutionally impossible. There is, in this process, an institutional bias or prejudice which cannot effectively handle a fundamental problem such as this. The judiciary is, of course, not the only institution which can be accused of this interest in self preservation. At least in the limited context of sentencing, the courts can recognize this inherent

institutional bias and the debilitating effect that it has on the administration of justice. Having recognized it, an appellate court can eliminate it by simply not permitting an increase of punishment after a second trial. Only in this way can the institutional bias of the judiciary be effectively neutralized.

The United States Supreme Court has, of course, always taken a special interest in constitutional issues which would have a chilling effect on one's assertion of a constitutional right. There is ample authority from cases decided by the Supreme Court which indicate that it would look upon with a dim view the chilling effect that the appellate process may pose to one who has had the death penalty imposed as a result of having successfully appealed his first conviction.

In Green v. United States (1957), 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, defendant Green was charged with first degree murder and was convicted of second degree murder. A state court reversed the conviction, and upon retrial, Green was convicted of first degree murder. In reversing the conviction, the United States Supreme Court grounded its decision on the double jeopardy clause, holding that at the first trial the conviction of second degree murder carried therein an implied acquittal of the higher charge of first degree murder. By itself, the holding may not stand for too much in the context of Fitzpatrick here facing the death penalty the second time around. But the court, in deciding the case, also rejected the government's argument that a defendant, by appealing a conviction, must be willing to take a gamble that he may be convicted of a greater crime the second time around:

> ". . . the Government contends that [defendant] must be willing to barter his constitutional protection against a second prosecution for an offense punishable by death as the price of a

> successful appeal from an erroneous conviction
> of another offense for which he was sentenced to
> five to twenty years' imprisonment.  As the
> Court of Appeals said in its first opinion in
> this case, a defendant faced with such a 'choice'
> takes a 'desparate change' in securing the
> reversal of the erroneous conviction.  The law
> should not, and in our judgment does not, place
> the defendant in such an incredible dilemma."
> 355 U.S. at 193, 78 S.Ct. at 226, 2 L.Ed.2d 207;
> 61 A.L.R.2d 1127.

Without question, the court concluded that the prospect of a death penalty is too high a price to pay for the assertion of a constitutional right.

In a different context, but with the same policy consideration involved, the court decided Fay v. Noia (1963), 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 877.  There, in opposing the defendant's petition for a writ of habeas corpus on the grounds that he had a chance to appeal many years ago and did not do so, the government contended that the defendant had waived his right to invoke habeas corpus.  To this, the Supreme Court answered:

> ". . . For Noia to have appealed in 1942 would
> have been to run a substantial risk of electro-
> cution.  His was the grisly choice of whether to
> sit content with life imprisonment or to travel
> the uncertain avenue of appeal which, if successful,
> might well have led to a retrial and death sentence.
> . . . He declined to play Russian roulette in this
> fashion.. . ."  372 U.S. at 439-40.

Admittedly, the issue of whether the death penalty could be constitutionally imposed after a second trial and conviction, was not directly before the Court.  But the specter of such a result is such that even the possibility is anathema to our system of justice.  This is the essence of Fay.

This same policy consideration was expressed in Jackson v. United States (1968), 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138.  There, the defendant challenged a provision of the Federal Kidnapping Act, which provided for the death penalty only "if the verdict of the jury shall so recommend." The Court ruled that such provision "needlessly encourages"

-62-

waivers of jury trials or guilty pleas to avoid the possibility of the death penalty. One could assert his constitutional right of jury trial only at the risk of the death penalty. This, the Court ruled, is an intolerable burden on the exercise of a constitutional right. 390 U.S. at 585.

The possibility of a death penalty being the price one must pay for securing a reversal of a conviction and a second trial is, under any system of justice having fundamental fairness as one of its basic tenets, intolerable. Had the majority considered the implications of its decision and the burden it placed on the availability of the appellate process, I believe that this Court would never have had to decide whether the sentencing court had properly applied Pearce.

What happened here, however, is even worse. Not only has the majority failed to acknowledge the fundamental due process issue underlying an increase of punishment to that of death after the second trial, this omission has been compounded by the majority's analysis of Pearce. In reaching its decision that the sentencing court lawfully complied with Pearce in increasing the punishment to that of death, the majority has totally nullified the Pearce standards.

IV. IN IMPOSING THE DEATH PENALTY AFTER THE SECOND TRIAL, THE SENTENCING COURT IGNORED THE STANDARDS SET FORTH IN PEARCE; AND IN REVIEWING THE SENTENCE, THIS COURT HAS OBLITERATED THE STANDARDS SET FORTH IN PEARCE.

I have already set forth the background of the federal and state decisions which prompted the United States Supreme Court to decide the case of Pearce, supra. Since the majority has not done so, it perhaps would be useful to set out the essential facts of Pearce and the rules promulgated by the majority decision in Pearce.

-63-

Pearce was one of three cases decided on essentially the same point. Pearce was convicted of a crime and successfully appealed this conviction to a higher court and was granted a new trial. After his retrial, presided over by a different judge, he was again convicted, but this time he was given a greater punishment than after his first conviction. He contended this greater punishment violated the double jeopardy and due process provisions of the United States Constitution. The Supreme Court disagreed, holding that neither the double jeopardy nor /protection clauses are violated by imposition of a greater punishment. However, in so holding, the Supreme Court recognized the great potential for evil that inheres in such a process and so adopted specific standards which must be followed before the greater punishment can be upheld. The Supreme Court expressly recognized that without close scrutiny of such cases, the end result is that a defendant is needlessly punished by exercising his right of appeal.

The sentencing court and the majority opinion has patently ignored the requirements of Pearce. Furthermore, in seeking to justify its cancellation of the Pearce requirements in this State, the majority has patently misinterpreted and misapplied three United States Supreme Court cases decided after Pearce. Those cases are Colten v. Kentucky (1972), 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584; Chaffin v. Stynchcombe (1973), 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714; and Blackledge v. Perry (1974), 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628. It apparently is the position of the majority here that these three cases have effectively vitiated the standards set forth in Pearce so that it is after only eleven years of existence, no longer the law. To the contrary, Pearce is alive and well, but unfortunately, ignored in this State.

It is true, as the majority states, _Pearce_ is primarily aimed at detecting vindictiveness in the imposition of a higher punishment after a second trial. Thus the following standards must be used whenever an increased punishment is imposed after a second trial:

> (1) The sentencing court must affirmatively state on the face of the record, its reasons for imposing the higher penalty and set forth the factual data supporting this decision.

> (2) The factual data used to justify the higher penalty must consist of specific, identifiable conduct of the defendant occurring after the time of the original sentencing proceedings. 395 U.S. at 725-726.

Unfortunately the sentencing court and this Court somehow ignored the application of these standards to this case. The three reasons announced by the sentencing court and given the green light by this Court for increasing the punishment to death are: (1) that defendant testified at his second trial permitting an assessment of his character; (2) that Christine Fetters gave considerable information relating to defendant's activities in planning the crime and in relation to his conduct after the commission of the crime; and (3) that the constitutionality of the death penalty at the first trial was in doubt, but now all doubts have been resolved. None of these stated reasons comply with the _Pearce_ standards.

A. THE DEATH PENALTY JUDGMENT ITSELF ADMITS NONCOMPLIANCE WITH _PEARCE_.

In a footnote at page 9 of the death penalty judgment, the sentencing court admitted its noncompliance with _Pearce_ and set forth its reasons for departing from the _Pearce_ standards:

> "This increase in sentence from the 100 years previously given admittedly raises a question for consideration upon review. North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, allows

-65-

for the imposition of a greater sentence in the light of events subsequent to the first trial that may throw some light upon the defendant and such information may come to the judge's attention from evidence adduced at the second trial itself, as well as other sources. At the same time, in requiring that a more severe sentence must be accompanied by a showing of the reasons for the increase in severity, the reasons . . . ' must be based upon the objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding.' (Emphasis added by District Court.) The question then is whether the judge can act only upon subsequently occurring conduct or whether he can act upon new information concerning past conduct which was not known to the judge at the time of the prior sentencing. I have interpreted the Pearce decision as being aimed at preventing vindictiveness against a defendant for having successfully attacked his first conviction, and therefore have concluded that the evidence necessary to justify a more severe sentence can come from new information about the defendant's conduct in the commission of the crime, i.e. past conduct as well as from new conduct occurring after the original proceeding. Admittedly, there has been no new conduct relevant to that issue in this case." (Emphasis added by J. Shea.)

By his own admission, the sentencing judge relied on conduct of the defendant which preceded the first sentencing, but chose to give Pearce his own special interpretation in order that he could consider this information. This interpretation flies in the face of the Pearce standards.

We thus have a situation where the sentencing court openly admitted that it did not comply with Pearce but declared that it really did not matter because it was not vindictive, and that Pearce was aimed only at vindictiveness. At least, however, the sentencing court did not attempt to rationalize its decision by asserting that the United States Supreme Court had later retreated from strict enforcement of the Pearce standards. It simply ignored the Pearce standards. On the other hand, the majority opinion has misinterpreted and misapplied three post-Pearce cases and would have us believe that the United States Supreme Court has already abandoned the standards set forth in Pearce in 1969.

-66-

Each of the cases cited and quoted by the majority can be understood only in the peculiar circumstances existing in each case. The United States Supreme Court did not apply the _Pearce_ standards in Colten v. Kentucky, supra, and in Chaffin v. Stynchcombe, supra, because the legal structure existing in the appellate process and later sentencing process satisfied the Court that vindictiveness as a factor in the imposition of a higher sentence, was deminimis. On the other hand, contrary to the implications of the majority opinion, in Blackledge v. Perry, supra, the Supreme Court extended the _Pearce_ standards by applying them to a prosecutor who was permitted by state law to charge a defendant with a higher degree of crime if the defendant appealed his conviction to a higher court. A brief analysis of each of these cases is in order.

B.  THE MAJORITY HAS MISINTERPRETED AND MISAPPLIED THREE DECISIONS OF THE UNITED STATES SUPREME COURT.

In Colten v. Kentucky, supra, the situation involved a two-tiered trial system. A defendant convicted at the lower court and sentenced, had an absolute right to appeal to the higher court and have his case tried again. The lower court found defendant guilty and fined him $10; the defendant appealed to the higher court; he was found guilty after a trial de novo, and the fine was increased to $50. He claimed that this was retaliatory sentencing and thus prohibited by _Pearce_. The Supreme Court disagreed, holding that the threat of vindictiveness was de minimis where defendant was entitled to a complete retrial of the facts without reference to what happened at the lower court or to the fact of the appeal itself. Here, it was the system itself upon which the Supreme Court focused, not on whether there was actual vindictiveness demonstrated by the record.

-67-

Although I agree with Justice Marshall's dissent, it is at once obvious that Colten v. Kentucky has no bearing on the issue before this Court, for the instant case does not involve a two-tiered system involving trial de novo. Nor does this case involve an increase of a fine from $10 to $50.

In Chaffin v. Stynchcombe, the jury set the punishment after the first conviction, and a different jury set the second punishment after the second conviction. The jury's involvement in the setting of the higher penalty rendered de minimis the chance that the second jury imposed penalty was the product of vindictiveness. The Supreme Court specifically noted that it was conceded that the second jury did not know the penalty which the first jury had imposed, and that the second jury would "have no personal stake in the prior convictions and no motivation to engage in self-vindication." 412 U.S. at 27. This situation contrasts starkly with the instant case. Here the second sentencing judge had specific knowledge that the first judge had given a 100 year sentence rather than impose the death penalty. Furthermore, the second judge here would have no less institutional interest than the first judge, in discouraging or preventing what they considered to be nonmeritorious appeals. A jury, on the other hand, does not have such institutional interest in preserving the system.

Nor can the majority derive any support from Blackledge v. Perry. Indeed, the Supreme Court extended the <u>Pearce</u> rationale by applying/it to a system which permitted the prosecutor to raise the ante if a defendant sought trial de novo in a higher court. Defendant was convicted of a misdemeanor and pursued his absolute statutory right of appeal and trial de novo in a higher court. The law, however, permitted the

-68-

prosecutor to obtain an indictment charging a more serious offense, and then to proceed to trial only on the more serious charge. The prosecutor filed a more serious charge against the defendant, and this, the Supreme Court held, violated the Pearce standards for it discouraged convicted misdemeanants from pursuing their statutory appellate rights of trial de novo. Concerning this statutory scheme permitting the prosecutor to raise the ante, the Supreme Court stated:

> "A person convicted of an offense is entitled to pursue his statutory right to a trial de novo, without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration." 417 U.S. at 28.

Thus, it is patently clear that the United States Supreme Court, in determining whether the statutory scheme or the action of the sentencing court would have a tendency to chill the right of appeal by threat of higher punishment the second time around, will focus on the system itself as well as the particular facts. The Court does not require that a defendant demonstrate that the sentencing court acted maliciously or in bad faith.

The chilling effect of the sentencing court raising the ante from 100 years in prison after the first trial to that of death after the second trial, speaks for itself. What is even more chilling is the clear, announced departure from Pearce on the part of the sentencing court as well as the decision of this Court in failing to recognize that even token compliance with Pearce did not exist in this case.

The rationale of the majority in concluding that somehow Pearce does not apply, is patently erroneous. The majority states:

> "Therefore we conclude that Pearce does not apply in defendant's case because the District Judge was replaced for the new trial and sentencing and he stated his reasons for imposing the death penalty on these charges with clarity."

-69-

The majority erroneously concludes that Pearce has no application if a new judge presides over the second trial and resentencing. But such is not the case at all. A reading of Pearce does not disclose whether a new sentencing judge presided over any of the three separate cases which were decided, or whether it was the same judge in each instance. But that is not the point of Pearce in any event. Indeed a reading of the three post-Pearce Supreme Court cases cited and misapplied by the majority, would lead one to believe that a new judge presiding over the second trial and sentencing would require a strict Pearce application. Furthermore, each of the three defendants involved in the Pearce decision received increased jail or prison sentences. That is a far cry from the defendant here, who was confronted with the horrible dilemma of being faced with a potential death penalty after a second trial.

In Chaffin v. Stynchcombe, the Supreme Court referred to the second jury which had set the increased punishment after the second trial, as having "no personal stake in the prior conviction and no motivation to engage in self-vindication." 412 U.S. at 27, 93 S.Ct. at 1983, 36 L.Ed.2d at 724. But the majority here has twisted this statement around to apply to the second sentencing judge whose sentence is now under review here. The United States Supreme Court was referring to a two-tiered system of trials whereby the jury in the event of conviction, also set the punishments. Indeed, in declaring that the imposition of punishment by the jury insulated the decision from the possible taint that would exist had it been a judge who determined the second punishment, the Supreme Court specifically noted that a jury has no institutional interest in discouraging nonmeritorious appeals but a judge does have such institutional interest. Indeed, under the rationale of Chaffin, the fact that a judge here did impose the greater punishment is sufficient to subject the sentencing to the Pearce standards.

The second reason why Pearce does not apply, according to the majority, is that "the sentencing judge stated his reasons for imposing the death penalty on these charges with clarity." I fail to see how this has anything at all to do with whether or not Pearce applies. Assuming that the reasons for increased sentence were stated with particularity, this fact does not eliminate our review functions under Pearce to determine if the reasons stated, regardless of how clear, are legally sufficient. Indeed, an examination of the reasons given reveals that both the sentencing court and this Court have vitiated the Pearce standards. Since the majority has set forth the reasons why the penalty was increased, but has not stated the underlying evidence in support of the stated reasons, I feel compelled to do so.

C. THE SENTENCING COURT AND THIS COURT HAVE NULLIFIED THE STANDARDS SET FORTH IN PEARCE.

As a starter, the sentencing court admitted within the body of the judgment that it had departed from the Pearce standards but in the same breath announced that it was not vindictive and therefore that it still was complying with the spirit of Pearce which was aimed at weeding out vindictive increases in punishment.

So that the record is clear, I again set out the majority's statement of the reasons announced by the sentencing judge in justification of his increase in punishment to that of death:

> "(1) The defendant testified at the second
> trial, allowing for an assessment of his
> character.

> "(2) Christine Fetters, a witness who did
> not testify at the first trial, yielded consider-
> able information concerning defendant's conduct
> during the planning and execution of the crime,
> as well as his actions subsequent to the
> commission of the crime.

-71-

"(3) The constitutionality of the death penalty provision for the crime of deliberate homicide was no longer in doubt as it had been when the first judge imposed the 100 year prison sentence."

The only reason which conceivably could comply with the Pearce standards, is the first reason stated, and as I will later discuss, this so-called character assessment during the second trial is fraught with danger.

Each of these stated reasons must be lined up with the requirements set forth in Pearce that there be in the record, objective conduct of the defendant occurring after the first sentencing, and a clear statement of the sentencing court of what objective conduct it used as a basis to conclude that an increased punishment was justified. Pearce also set forth the possible sources for obtaining this information:

". . . events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct and mental and moral propensities.' Williams v. New York, 337 U.S. 241, 245. Such information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources." Pearce, 395 U.S. at 723.

The following is what the sentencing court stated in the record concerning the importance of and its reliance upon the testimony of Christine Fetters:

". . . Also, an entirely new witness. Christine Fetters, defendant's girlfriend during the entire time from defendant's release from prison on March 28th, 1975, to his arrest in Spokane, Washington, on June 3rd, 1975, yielded information concerning the conduct of the defendant during the time period when the crimes here involved were planned and executed, as well as during their travelling subsequent to the commission of the crimes.

"This included further and more definite affirmation that it was the defendant, who, yielding sua sponte to his lack of regard for human life, fired the fatal shots into Monte Dyckman's head, much to the consternation of the other participants to the crime who were upset at a robbery being escalated into murder.

-72-

"Also included are the actions of the
defendant in burying the murder weapon used
against Dyckman and thereafter arming himself
with another handgun and carrying it with him
during the course of their constant travelling
to 'blow their way out,' or language to that
effect, in the event anyone should stop them.

"Further, there is the evidence of subtly phrased
language in a letter to Christine Fetters after
his apprehension, which language could only be
interpreted as threats against the lives of her
children because of defendant's erroneous assumption
that Christine Fetters had been the cause of his
arrest." (Sentencing Court's Judgment of Death at
5-6.)

Assuming that the activity itself is sufficient to

justify an increase of punishment from 100 years in prison

to that of death, it fails nonetheless because the entire

activity took place before the first sentencing. Pearce

requires that it be objective conduct of the defendant that

has occurred after the first sentencing. 395 U.S. at 726.

The sentencing court at least acknowledged its failure to

comply with Pearce in this regard. See Judgment at 9.

But the majority opinion has not even mentioned this fatal

act of noncompliance.

The second reason advanced for increasing the punishment

to death is that at the second sentencing the constitutionality

of the death penalty was no longer in doubt, whereas at the

first sentencing, doubt did exist and this may well have

prompted the first sentencing judge not to impose the death

penalty. In relying on these changes in the law, the sentencing

court stated:

"Further, it is apparent from a review of the
record of the prior trial that contentions had
been asserted that the penalty provision for
the crime of deliberate homicide was con-
stitutionally defective and the presiding judge
several times suggested that he could avoid that
constitutional question simply by not imposing
the death penalty in the event of a conviction
of such charge, and this feeling obviously attended
the judge's considerations even up to the time of
actually pronouncing sentence, as is evidence from
the copy of that portion of the transcript which is

-73-

attached hereto as Exhibit 'A' and 'A-1'.
Thus, the 100-year sentence was not arrived at
because of its appropriateness to the character-
istics of the defendant, but, rather, according
to the legal limitations the judge then felt were
in force. Changes in the law, nullifying the
prior constitutional concerns, have since been
accomplished and that fact, coupled with the new
and illuminating evidence appearing in the latest
trial bearing upon the life, health, habits, conduct
and mental and moral propensities of the defendant,
do constitute objective information concerning
identifiable conduct on the part of the defendant,
and its emergence post-dates the time of the original
sentence." Sentencing Court's Death Judgment at
6-7. (Emphasis added.)

The sentencing court did not specify what changes in the

law it had reference to, but I can only conclude that it had

reference to the 1977 statutes under which it sentenced the

defendant to death, and conceivably, to the first McKenzie

case, supra, which was decided before the sentencing here and

which upheld the then existing statutory sentencing scheme

as it had been applied to a death penalty case.

A change in the status of the law cannot under any cir-

cumstances be considered as evidence of the defendant's conduct.

It is, rather, merely a comment on a sad chapter in the history

of death penalty litigation in this State. It is nothing less

than astonishing to think that a sentencing court would list

subsequent changes in the law as a reason for increasing the

punishment to death.

The remaining justification for the increase of punish-

ment to that of death, is that the sentencing court gleaned

the necessary information from its observation of the defendant

at the second trial, and particularly from its observation

of the defendant's testimony while he testified on his own

behalf. (Defendant did not testify at his first trial.)

Assuming, however, that character analysis of a defendant's

demeanor while testifying constitutes specific and identifiable

conduct with the Pearce standards, this Court has been provided

absolutely no record to review. The sentencing record is devoid of any observations made or of character analysis performed by the sentencing judge.

The sentencing judgment contains two scant references to the fact that the sentencing judge, in reaching its decision to increase the punishment to death, considered defendant's demeanor and testimony at his second trial. The judgment does not tell us what observations were made or conclusions reached.

In the preamble portion of the judgment there is a brief reference to the sentencing court having considered defendant's demeanor and testimony at the second trial:

> ". . . and after observing the defendant's demeanor during the trial and while testifying on his own behalf, the Court now makes the following findings, conclusions, judgment and order:" Sentencing Court's Judgment at 2.

In one portion of the findings there is another brief reference to the fact that the trial court considered defendant's demeanor as a factor in his decision to increase the punishment to the death penalty:

> ". . . Specifically, the defendant testified at his own behalf during the present trial, allowing for an assessment of the defendant in all ways that viewing demeanor and the manner and content of testimony can be productive of insight into the character of a witness." Sentencing Court's Judgment at 6.

The foregoing is the sum and substance of the character analysis performed by the sentencing court upon the demeanor and testimony of the defendant at his second trial.

What was so obnoxious or reprehensible about the defendant's conduct at his second trial, or his testimony at his second trial, that the sentencing court, in its omniscience, could determine that the defendant must die? The court may indeed have been possessed of the wisdom of

-75-

Solomon in making its decision, but if it was so possessed, it did not provide this Court with the benefit of such wisdom by which we can conclude that the requirements of Pearce had been satisfied.

Notwithstanding the failure to set forth the character analysis for the record, character analysis is by its very nature subjective, and thus cannot comply with the objective standards of Pearce. Not every trial judge would view the defendant's conduct at the second trial in the same way, and not every trial judge would view the defendant's testimony in the same way. Pearce requires, on the other hand, that the conduct of the defendant be specific and identifiable.

The subjective nature of character or demeanor analysis prevents effective appellate review. The proceedings here were not videotaped, nor even voice recorded. All we have before us is the cold record of the trial and the cold record of the sentencing hearing. These records are a totally inadequate basis upon which the Court can begin to review a character analysis. Indeed not even videotapes or voice recordings would aid us in this task because the review process itself, by the nature of the subject matter, would be a subjective process. It is highly unlikely that each member of this Court would make the same observations of the defendant as did the sentencing court, and it is equally as unlikely that each member of this Court would make the same analysis as did the sentencing court. Review under such circumstances is meaningless.

Use of character analysis such as used here, will, moreover, have an absolutely chilling effect on the choice of a defendant to take the witness stand at his second trial. If a defendant knew that his mere presence at the second trial, or his testimony at the second trial, would constitute

-76-

an evidentiary basis under <u>Pearce</u> to permit an increase

of the punishment to death, the chances are that he

would not testify at all. He would be afraid to testify

in his own case for fear that the sentencing court would use

his testimony as the so-called objective conduct upon which

a death sentence could be predicated. This is the kind of

"grisly" choice that the United States Supreme Court has

condemned. United States v. Green, supra; Fay v. Noia,

supra; United States v. Jackson, supra.

V. SENTENCE REVIEW: A STATUTORY AGGRAVATING CIRCUMSTANCE

CANNOT BE APPLIED TO THE DELIBERATE HOMICIDE COMMITTED IN

THIS CASE.

The majority here has totally missed the main point

of sentence review as it applies to this case. It is a

rather simple matter to analyze a few cases involving the

death penalty and conclude that they are of no help to the

defendant. Section 46-18-310, MCA sets forth the duties

of this Court in regard to sentence review:

> "The supreme court shall consider the punishment
> as well as any errors enumerated by way of
> appeal. With regard to the sentence, the court
> shall determine:
>
> "(1) whether the sentence of death was imposed
> under the influence of passion, prejudice, or
> any other arbitrary factor;
>
> "(2) whether the evidence supports the judge's
> finding of the existence or nonexistence of the
> aggravating or mitigating circumstances enumerated
> in 46-18-303 and 46-18-304; and
>
> "(3) whether the sentence of death is excessive
> or disproportionate to the penalty imposed in
> similar cases, considering both the crime and
> the defendant. The court shall include in its
> decision a reference to those similar cases it
> took into consideration."

It is clear to me that the death penalty for deliberate

homicide was imposed notwithstanding the clear failure to

establish an evidentiary basis for the existence of a

-77-

statutory aggravating circumstance. This being so, I

conclude that the sentence imposed violated sections

46-18-310(1) and (2), MCA.

All of the aggravating circumstances for either

homicide or kidnapping, are set forth in section 95-2206.8,

R.C.M. 1947, now section 46-18-303, MCA, which provides:

"Aggravating circumstances. Aggravating
circumstances are any of the following:

"(1)  The offense was deliberate homicide and
was committed by a person serving a sentence
of imprisonment in the state prison.

"(2)  The offense was deliberate homicide and
was committed by a defendant who had been
previously convicted of another deliberate
homicide.

"(3)  The offense was deliberate homicide and
was committed by means of torture.

"(4)  The offense was deliberate homicide and
was committed by a person lying in wait or
ambush.

"(5)  The offense was deliberate homicide and
was committed as a part of a scheme or operation,
which, if completed, would result in the death
of more than one person.

"(6)  The offense was deliberate homicide as
defined in subsection (1) (a) of 45-1-102, and
the victim was a peace officer killed while
performing his duty.

"(7)  The offense was aggravated kidnapping which
resulted in the death of the victim."  (Emphasis
added.)

Section 95-2206.10, R.C.M. 1947, now section 46-18-305,

MCA, provides, inter alia, that before the death penalty

can be imposed, at least one or more of the statutory

aggravating circumstances must be found to exist.  Thus,

before the sentencing court could impose the death penalty

for deliberate homicide, it was required to find at least

one statutory aggravating circumstance.  It found the

aggravating circumstance to exist under subsection (4) which

provides "the offense was deliberate homicide and was

committed by a person lying in wait or ambush."  (Emphasis

added.)

-78-

The vital question is, of course, whether defendant committed the homicide while "lying in wait or ambush." The sentencing court found that he did; but its own findings belie this conclusion. An analysis of the evidence and of the sentencing court's findings clearly establishes that defendant was not lying in wait or ambush at the time he killed Monte Dyckman. Indeed, the finding that defendant was lying in wait or ambush does not relate at all to the actual homicide. Rather, the finding describes defendant as "lying in wait or ambush" at the bank, waiting for the person to arrive from the Safeway Store with the receipts from the day's business.

Following are the findings set forth in the judgment with regard to the statutory phrase ". . . lying in wait or ambush":

> "That on the 5th day of April, 1975, being only eight days after his release from the Montana State Prison, the defendant was lying in wait or ambush at the Big Horn Drive-in Bank of Hardin, Montana, for the arrival of an employee of the Hardin Safeway Store carrying the store receipts for deposit in the bank. The courier on that night was a young man, Monte Dyckman, who occupied the position of assistant manager at Safeway. Upon his arrival at the drive-in bank, Dyckman was robbed by the defendant and then abducted in his own automobile, his hands being bound behind his back and he was taken by the defendant to the Toluca Interchange approximately 12 miles west of Hardin where, in a secluded spot behind a pile of gravel, the defendant shot him twice in the head with a .45 caliber semi-automatic pistol, causing instantaneous death. That such death was the proximate result of robbery plans initiated several days earlier.. . ." Judgment at 2. (Emphasis added by sentencing court.)

Having thus found that defendant was "lying in wait or ambush" at the bank while waiting for the person to show up with the day's receipts from the Safeway Store, the court then determined that this fit within the meaning of the aggravated circumstance for deliberate homicide,

-79-

that is, that the homicide was "committed by a person lying in wait or ambush." There is nothing from the factual recitation in the judgment however, from which one can even conclude that the intent of defendant to kill Monte Dyckman preexisted or arose while he was waiting at the bank. Indeed, the remaining findings of the sentencing court clearly establish that defendant's decision to kill Monte Dyckman was a spur of the moment decision which occurred some time later and several miles away from the bank.

In reciting what information he had obtained at the second trial concerning the circumstances of the commission of the crimes, the sentencing court offered the following analysis or findings:

> ". . . Also, an entirely new witness, Christine Fetters, defendant's girlfriend during the entire time from defendant's release from prison on March 28th, 1975, to his arrest in Spokane, Washington, on June 3rd, 1975, yielded information concerning the conduct of the defendant during the time period when the crimes here involved were planned and executed, as well as during their travelling subsequent to the commission of the crimes. This included further and more definite affirmation that it was the defendant, who, yielding sua sponte to his lack of disregard for human life, fired the fatal shots into Monte Dyckman's head, much to the consternation of the other participants to the crime who were upset at the robbery being escalated into murder." Judgment at 6-7. (Emphasis by sentencing court.

Thus the sentencing court's own findings clearly foreclose any determination that the deliberate homicide was committed while "lying in wait or ambush." The court found that the defendant's decision to kill Monte Dyckman was a "sua sponte" decision, and that all those involved believed that robbery was the only objective.

The obvious gravamen of subsection (4) is that the legislature considers a homicide to be more serious if the perpetrator was "lying in wait or ambush" at the time the deadly act was unleashed against the victim. But here,

-80-

however despicable the crime committed, it does not fall within the statutory aggravating circumstances of subsection (4). The defendant was not lying in wait or ambush for Monte Dyckman when he killed him.

It has always been my understanding that penal laws are to be strictly construed against the State. There is no more compelling reason to do so than where the death penalty is the potential punishment. But rather than strictly construing these laws against the State, the majority here has liberally construed them in favor of the State in order to justify the imposition of the death penalty.

Defense counsel did not raise the issue of the non-existence of a statutory aggravating circumstance which thus prevents the imposition of the death penalty. Why he did not do so I do not know. But regardless of whether he raised the issue, this Court has the clear duty under section 46-18-309(2), supra, to determine "the existence or nonexistence of the aggravating . . . circumstances" enumerated in the statute. Furthermore, even without this statute, we owe this duty to any defendant who has been sentenced to death.

This duty of review exists regardless of whether defense counsel has done so. Furthermore, especially in a death penalty case, it is the duty of the State, and particularly the Attorney General's Office, to carefully review the record to determine whether there has been compliance with the statutes. If there has not been compliance, it is the duty of the State to so inform this Court. Obviously, the State here either failed to adequately review the record, or, if it did so, and found the defect, the State has deviated

-81-

from the standards of ethical practice by not bringing this fact to the Court's attention.

We have here a situation where the sentencing court retroactively applied the 1977 death penalty statutes, and by so doing, it was able to sentence defendant to death for the crime of aggravated kidnapping. It used the same statutes, moreover, in sentencing defendant to death for the crime of deliberate homicide. Although the majority has approved of this retroactive application, it is nonetheless clear that the sentencing court was not and could not be fair to defendant at the sentencing hearing and in the process of reaching its decision to impose the death penalty for both convictions.

When the sentencing court sentenced defendant to death for the crime of deliberate homicide, there can be no doubt that it violated North Carolina v. Pearce standards set forth by the United States Supreme Court. Indeed, the sentencing court admitted that it did not comply with the mandates of Pearce, but it sought in its decision to justify the noncompliance by its wholly subjective determination that it was not vindictive and thus that it complied at least with the spirit of Pearce. Furthermore, there can be no doubt that a statutory aggravating circumstance did not exist as a necessary prerequisite to permit the imposition of the death penalty for the crime of deliberate homicide. Indeed, the twisted and tortured application of the aggravating circumstances statute to the facts of the deliberate homicide here, is clear evidence of the bias with which the sentencing court approached its duties of presiding over the sentencing hearing and reaching a sentencing decision. By ignoring the mandates of Pearce, and by ignoring the facts in applying the statutory aggravating circumstance statute, the sentencing

-82-

court not only poisoned the deliberate homicide death sentence, it poisoned its entire decision. It is difficult to rationalize and uphold a death penalty for aggravated kidnapping, where, in the same process, the sentencing court was so blatantly in error in reaching its decision to impose the death penalty for deliberate homicide.

Regardless of whether the death penalty may be a permissible form of punishment, a fair interpretation of those laws does not give this Court or any court the license to so loosely interpret them to the extent that a sentencing court can interpret them with virtual impunity. Perhaps this is one of the real dangers of the death penalty hysteria; the courts too, are swept along in the process.

For all of the foregoing reasons, I would set aside the death penalties imposed and remand for resentencing with instructions that the death penalty is not to be considered in this case.

Daniel J. Shea

Justice